## No. 26978

**Cache La Poudre Water Users Association and North Poudre Irrigation Company v. Glacier View Meadows**

(550 P.2d 288)

Decided June 1, 1976.

54

Hill & Hill; Fischer, Brown, Huddleson & Gunn, Ward H. Fischer, for objectors-appellants.

Moses, Wittemyer and Harrison, P.C., David L. Harrison, for applicant-appellee.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

The applicant Glacier View Meadows, a limited partnership, is a developer of residential lots in the mountains northwest of Fort Collins, Colorado. It filed with the water court two applications for approval of a plan of augmentation. The plans would provide future owners of presently unimproved lots with domestic water from wells to be drilled in the future. The two applications were consolidated in the trial court. Two other similar applications were filed, which involve a maximum of 1344 residential units in addition to the 1892 here involved. Under stipulation of the parties thereto, the two similar applications are being held in abeyance awaiting the outcome of this appeal. The lands embraced in the developments are not within a designated ground water basin as defined in section 37-90-103(6), C.R.S. 1973. The court granted approval of the plan for augmentation in the first two applications. We affirm with some modifications.

The objector, North Poudre Irrigation Company, is a ditch and reservoir company. The objector, Cache LaPoudre Water Users Association, is a nonprofit protective association, whose members own substantial reservoir and direct flow decrees on the Cache LaPoudre River.

There was a stipulation as to the facts. As a part thereof, the parties stipulated as to what their respective witnesses would testify. The case was submitted to the water court upon this stipulation.

The applicant owns 75 "preferred shares" of the Mountain and Plans Irrigation Company, which entitle applicant to both reservoir and direct

flow water. Applicant acquired these 75 shares from Ideal Cement Company, Dreher Pickle Company and City of Fort Collins, which historically had made year-around use of their water. Under the plan some of applicant's reservoir rights will be used to replace consumptively used water from proposed wells. The water from the wells will be exclusively devoted to in-house, residential domestic use.[1] Under the two applications which are the subject of the court's decree, there will be a maximum of 1892 single-family residential units. In some cases, one well will furnish water for more than one unit.

The reservoirs containing replacement water and the points of discharge of water therefrom into the stream, as well as all of the residential units and the points of return flow therefrom into the stream, lie above the points of diversion of any water of the objectors.

The stipulated testimony is in dispute as to several matters. The facts we now recite come from the findings of the court, which findings are supported by sufficient evidence under the stipulation.

Of the 1892 units, at ultimate development 105 units are expected to use an evapotranspiration system of sewage disposal. The consumptive use for these 105 units will be 100% of the water diverted from wells. This 100% will be replaced entirely by reservoir water plus enough to account for evaporative losses during transportation in the stream.

The remaining 1787 units, when ultimately developed, will have septic-soil absorption sewage systems. From these latter diversions there will be a consumptive use of not more than 10% and at least 90% will constitute return flow to the stream. Replacement water for the 10%, plus an amount sufficient to embrace transportation losses, will be replenished by the aforementioned releases from the reservoirs.

The rate of flow permitted and claimed for each well will be four gallons per minute for each dwelling unit to be served by any well. The plan is predicated upon the assumption that each dwelling unit will be occupied by 3.5 persons 365 days a year, and that each person will require 80 gallons of well water per day. The entire consumptive use of well water (including those units having 100% consumptive use) will not exceed 89 acre feet per year. 55 of applicant's 75 shares will be devoted to replacement of this consumptively used water. 55 shares represent an amount of 94.71 acre feet per year. After deducting 5% for transportation losses, 89.97 feet remain for replacement.

The decree contains the following provision:
"Under such plan [the Association will have released] to the Cache La Poudre River such portions of the water to which it is entitled by virtue of

---

[1]Some of applicant's direct flow water and other of its reservoir water will be used in the "greenbelt area of the development." This water is not involved in the case.

its ownership of 55 shares of preferred stock in the Mountain and Plains Irrigation Company as are required to compensate for annual depletions caused by its development, and to prevent material injury to the owners and users of vested water rights and decreed conditional water rights. Applicant or the association described in paragraph 18 hereof will furnish the Division Engineer, Water Division 1, quarterly reports on the numbers of dwellings which have been constructed in the development and are suitable for occupancy and the type of sewage disposal system for each until such time as applicant's development shall have been completed. The amount of water to be released per day during any time of need by a vested water right or a decreed conditional water right entitled thereto, will be equal to the number of dwelling units then built using absorption sewage systems plus ten times the number of dwelling units using evaporative waste systems, all multiplied by 0.0000904 acre feet per day (0.020 g.p.m.). The Division Engineer, Division 1, may use his discretion in aggregating such releases for more efficient administration but in no case will the releases total more than 94.71 acre feet per year.''

As mentioned earlier, the applicant acquired the 75 shares from Ideal Cement Company, Dreher Pickle Company and the City of Fort Collins. Historically, only 25% of the water used by these three returned to the stream. The plan allocates the water from 20 of the 75 shares of stock for use in the stream in lieu of the 25% return flow which no longer exists.

The return flow from these three sources was obtained for each month of the year, being an annual aggregate of 31.29 acre feet. The decree fixes the discharges of reservoir water into the stream, representing this return flow plus transportation losses and other factors, on a daily basis for each month, thereby assuring more than the historic return flow from the three sources. Using a factor of 30 days per month, we convert the monthly figures into an aggregate annual amount of 34.2 acre feet per year. The decree fixes a maximum for this purpose of 34.44. Within this limitation the Division Engineer may use his discretion in ''aggregating'' the releases for more efficient administration.

We find no mention of the subject in the record or the briefs, but assume that the replacement of return flow from the three sources just discussed is based upon the ultra-conservative view that the matter is treated as if the water represented by the 75 shares had been transported out of the water shed with no return flow or that such water was entirely consumptively used if devoted for some other purposes in the water shed.

An association has been or will be formed to implement the plan. The 75 shares of stock will be transferred to the association, which will be a fiduciary acting under the plan. The decree will be recorded and the effect thereof will be to create covenants running with the land with respect to all rights and obligations under it. In order to be under the plan, anyone acquiring a lot in the subdivisions involved prior to recording of the decree

must enter into a document to be recorded, which document will contain covenants running with the land and place the lot owner in the same position as if the owner had acquired the lot from the applicant subsequent to the recording of the decree. The association expressly is made subject to suit to enforce the plan. It will be the duty of the association to report to the Division Engineer any violations under the plan. The State Engineer is given authority by the decree to enforce the plan.

It is contemplated by the plan that, so long as its provisions are followed, there will be no injury to the holders of prior rights. However, if there is a call by a right superior to the association's priority rights, that call must be met. The water court concluded that the only thing that will upset the plan will be an extended period of drought. If such a drought causes insufficient water to be available for replacement, the well water users will be obliged to acquire additional water by lease or otherwise, or else to reduce their consumptive use, to the end that water consumptively used under the plan will not exceed that available for replacement.

## OBJECTORS' ARGUMENTS

The objectors object to the water court's conclusion that authority for the plan and its approval rests partially upon the fact that many of the wells are exempt from administration. Here we agree with the objectors.

The principal argument of the objectors is that, except during flood stages, the Cache LaPoudre River is over-appropriated. With this we agree. *Hall v. Kuiper*, 181 Colo. 130, 510 P.2d 329 (1973). The argument continues that, unless there is 100% replacement of the water taken from the wells, senior water rights will be injured and there will be a violation of the Water Right Determination and Administration Act of 1969 (section 37-92-101, *et seq.*, C.R.S. 1973, hereinafter called the "Act"), and the rules and regulations of the State Engineer's office.

Objectors argue that the water court has usurped the functions and duties of the State Engineer. According to statute, they contend, the request for a well permit, and action thereon by the State Engineer, is a condition precedent to the filing of an application for approval of the plan for augmentation. Objectors further assert that findings of availability of water for appropriation and of lack of injury to senior water users are prerequisite to issuance of well permits.

Further, it is argued, the reservoir water held in storage in the Cache LaPoudre Basin has been used historically so that, after use (presumably irrigation), 50% returns to the stream. The result is that the reservoir water, used under the plan for replacement of well water consumptively used, is 100% consumptively used with none thereof returning to the stream; and the result is that injury results to senior rights.

The objectors also contend that the depletion caused by water pumped from wells cannot be determined with sufficient accuracy to ascertain which water user has been injured by the withdrawal, or which

would be benefited by the release of the storage water.

Except as to our agreement with the propositions that the Cache La Poudre River is over-appropriated, and that the plan cannot be predicated partially upon the exempt status of many wells, we do not find the foregoing arguments of the objectors fatal to the plan and its approval.

### I.

As already indicated, the water court held that validity can be accorded some of the wells under the exemption provision of the Act (section 37-92-602, C.R.S. 1973). If a well is devoted solely to in-house use for one dwelling, then that water used will be under the statutory maximum for exempt wells. In contrast to the water court's reliance on exempt well status, it ruled that the State Engineer may lawfully be required to administer these wells as a condition of issuance of the well permits therefor.

Under the Act, an exempt well, standing alone, was and is free from regulation by either a water court or the State Engineer,[2]. When, however, one studies the portion of the Act relating to a plan for augmentation (section 37-92-302, C.R.S. 1973), the conclusion is inescapable that all wells involved in the plan must be treated as if they were non-exempt. Of necessity, the issuance of well permits, the adjudication of a plan for augmentation involving wells, and the enforcement of that plan and regulations involving wells, must relate to wells which are subject to administration. In other words, under the plan wells, which might be exempt otherwise, must be treated as non-exempt. Incidentally, applicant seeks nothing contrary to this ruling, stating in its brief, "This application is in no way based upon any statutory exemption of the anticipated wells or constitutional preference for domestic use."

We do not agree with the water court's requirement that the State Engineer fix an appropriation date of each well for which a permit is issued. Perhaps the water court did not have in mind that there would be priorities enforced against different well owners acting under the plan. We have assumed otherwise because of the use of the term "appropriation date." In any event, one of the fundamentals of the plan is that there will be equal priorities between well owners. If the use of the well water under the plan causes unlawful injury, it means that the provisions of the plan are being violated.

### II.

The objectors' assertion that there must be 100% replacement of withdrawn well water brings us to the major subject of the case: Is this plan of augmentation valid?

---

[2]"Regulation" does not involve the rights under appropriate circumstances of the judicial or executive department to investigate to see that the well is in fact exempt.

 First, we look to the Act, and here quote some of the legislative declaration underlying it and the definition of "plan for augmentation":

"(1) It is hereby declared to be the policy of the state of Colorado that all waters originating in or flowing into this state, whether found on the surface or underground, have always been and are hereby declared to be the property of the public, dedicated to the use of the people of the state, subject to appropriation and use in accordance with law. As incident thereto, it is the policy of this state to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all of the waters of this state.[3]

"(2) Recognizing that previous and existing laws have given inadequate attention to the development and use of underground waters of the state, that the use of underground waters as an independent source or in conjunction with surface waters is necessary to the present and future welfare of the people of this state, and that the future welfare of the state depends upon a sound and flexible integrated use of all waters of the state, it is hereby declared to be the further policy of the state of Colorado that in the determination of water rights, uses, and administration of water the following principles shall apply:

"(a) Water rights and uses vested prior to June 7, 1969, in any person by virtue of previous or existing laws, including an appropriation from a well, shall be protected subject to the provisions of this article.

"(b) The existing use of ground water either independently or in conjunction with surface rights, shall be recognized to the fullest extent possible, subject to the preservation of other existing vested rights, but, at his own point of diversion on a natural watercourse, each diverter must establish some reasonable means of effectuating his diversion. He is not entitled to command the whole flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled." Portions of section 37-92-102, C.R.S. 1973.

"'Plan for augmentation' means a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means." Section 37-92-103(9), C.R.S. 1973.

Except as specifically noted, we find that the plan of augmentation has been formulated and approved consonant with, and in furtherance of, the purpose and intent of our recent statutes; and that the plan is valid.

---

[3]*See Fellhauer v. People*, 167 Colo. 320, 447 P.2d 986 (1968).

We hold here, and in the companion opinion announced contemporaneously with this one, *Kelly Ranch v. Southeastern Colorado Water Conservancy District,* 191 Colo. 65, 550 P.2d 297 (1976), that under the plans for augmentation involved water is available for appropriation when the diversion thereof does not injure holders of vested rights.

Objectors cite *Southeastern Colorado Water Conservancy District v. Shelton Farms,* 187 Colo. 181, 529 P.2d 1321 (1974), in which this court ruled that one, who cuts down water-consuming vegetation (phreatophytes) along the Arkansas River, does not have a right to a decree for an equivalent amount of water to that consumed by the vegetation, free of the call of the river. In the opinion it was stated, "Appellees would substitute the priority doctrine with a lack of injury doctrine." The judgment was reversed and the cause remanded to the trial court with directions to vacate the decree. The indication from the foregoing that *Shelton Farms* stands for the proposition that lack of injury does not cause water to be available for appropriation must be analysed. *Shelton Farms* involved a factual situation which makes it distinguishable from this and *Kelly Ranch, supra.* In *Shelton Farms* it was said:

"Beyond question, the Arkansas River is over-appropriated. Water promised has not been water delivered, for there is simply not enough to go around. Thus, the question is not whether prior appropriators are injured *today* by appellees' actions. The injury occurred *long ago*, when the water-consuming trees robbed consumers of water which would have naturally flowed for their use. The harm was real and enormous. The logical implication of the injury standard is that *until senior consumers have been saturated to fulfillment*, any displacement of water from the time and place of their need is harmful to them."

There, the senior rights had adjusted to the loss of the water caused by the growth of phreatophytes; and, once returned to the river, the water would still belong to the senior users in satisfaction of their decrees. In the instant case, the water to be used in replacement never was that of the senior users. Here, there is not displacement "*from the time and place of their need.*" Under the findings here, the stream will be the same, irrespective of the well diversions.

██ Under the circumstances of this case, there is no significant difference between the prior appropriation doctrine, and the lack of injury doctrine. Here, where senior users can show no injury by the diversion of water, they cannot preclude the beneficial use of water by another. *Fellhauer, supra*, was cited as authority in *Shelton Farms*. It is likewise authority here. As was there said, "As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights*."

We rule that, in a matter such as this one, water is available for appropriation if the taking thereof does not cause injury. Therefore, the argument of the objectors, to the effect that water withdrawn from the wells must be replaced 100%, falls.

III.

The objectors contend that the court has usurped the function and duties of the State Engineer and that at least a request for a permit from him is a condition precedent to an application for approval of a plan for augmentation. We find nothing in the statutes which makes such a requirement for the plan under consideration. It is true that, if this plan required the completion or the immediate construction of wells, then the State Engineer's issuance of well permits, or his denial of the same, would be a prerequisite to approval of the plan. The argument of objectors is predicated upon the following provisions of the Act:

"In the case of applications for approval of a plan for augmentation, the form shall require a complete statement of such plan. In the case of applications which will require construction of a well, no decision, ruling, or order granting a water right shall be entered until the application shall be supplemented by a permit to construct a well or evidence of its denial by the state engineer pursuant to section 37-90-137 or evidence of the state engineer's failure to grant or deny such a permit within six months after application to the state engineer therefor." Section 37-92-302(2), C.R.S. 1973.

■ We do not interpret the statute to require action by the State Engineer upon application for well permit as a condition precedent to consideration and approval of a plan for augmentation. The above quoted language relates to a situation in which an application "will require construction of a well." We interpret the word "require" to mean that the plan must call for the completion or immediate construction of wells. This matter was tried prior to the amendment of section 37-92-307, C.R.S. 1973 by Colo. Sess. Laws 1974, ch. 111, 148-21-23 at 440, § 1. With the river being overappropriated, prior to that amendment and under ordinary circumstances, the State Engineer could not issue a well permit in an aquifer which was tributary to the stream. Therefore, under objector's interpretation of the statute, a plan for augmentation would necessarily have to be predicated upon a denial of well permits by the State Engineer. It is apparent that the purpose and intent of this statute under the circumstances involved here, is to permit the court first to approve or disapprove a plan, and if it approves of the plan, let the issuance of well permits follow. The court did not act outside its powers, nor did it usurp the authority of the State Engineer.

■ After a plan for augmentation has been approved, there must be applications for all well permits addressed to and granted by the State Engineer in order for the wells to be constructed under section 37-90-137,

C.R.S. 1973. It is true that approval of the plan eliminates certain things from consideration by the State Engineer upon an application for a well permit under the plan, but there are remaining other duties placed upon the State Engineer by the statute just cited. Further, we visualize that, after some wells have been constructed and are operable, on subsequent applications for wells under the plan, the State Engineer among other things may consider whether the plan actually is operating as contemplated and decreed. Further discussion of the respective parts played by the water court and the State Engineer's office is contained in *Kelly Ranch, supra.*

## IV.

■ The next argument of the objectors is that the applicant's reservoir water historically has been used so that 50% thereof has returned to the stream. The argument continues that, since applicant's reservoir water is being used to replace water which has been 100% consumptively used, the usual 50% is not being permitted to return to the stream. If the applicant has answered this, its response is oblique, to say the least. The plain and simple answer is that the reservoir water which the applicant acquired historically had been used in such a way that only 25% of that water returned to the stream after use. As has been already set forth, the applicant is returning all of this 25% flow, plus transportation losses, directly to the stream. The reservoir water used for replacement of well water consumptively used is in addition to the replacement of the 25%. It is clear that there has been no infringement upon the historic return flow to the stream.

## V.

■ The objectors argue that depletions caused by diversion of well water cannot be determined with sufficient accuracy to ascertain the extent of injuries by well water withdrawals and of benefits by replacement from storage water. We answer by quoting the record made by the water court:

"Inherent in the hydrological and geological analysis upon which the plan for augmentation herein is founded, is a degree of uncertainty, but the uncertainty is no greater than that inherent in the administration of water rights generally and is not of great significance. The assumptions upon which the plan is based allow more than adequate latitude. If the plan for augmentation is operated in accordance with the detailed conditions herein, it will have the effect of replacing water in the stream at the times and places and in the amounts of the depletions caused by the development's use of water. As a result, the underground water to be diverted by the development wells, which would otherwise be considered as appropriated and unavailable for use, will now be available for appropriation without adversely affecting vested water rights or decreed conditional water rights on the South Platte River or its tributaries."

## VI.

■ The water court in the companion case of *Kelly Ranch* ordered that there be paid in advance the court's docket fee, including $5.00 for the second well and $5.00 for each subsequent well contemplated by the plan. Under protest, the plaintiff paid $2,045, representing the docket fees for the second and subsequent wells. In the instant case the court required the payment only of the initial docket fee of $25 for filing the plan, and required that the $5.00 per well filing fee be paid subsequently at the time each permit for a well issued from the State Engineer's office. We approve the ruling made in this case.

## VII.

We now enter into a discussion *sua sponte.* In the conclusions made by the water court it was stated, "[T]he wells will have an appropriation date of the date of application for well permits from the State Engineer." We are not advised as to the purpose or effect of this statement. We wonder if it might have been intended as an adjudication of enforceable priorities as between different wells. These wells, of course, will be under the same plan and in the same development, although the well permits will have been obtained at different times.

It would seem that administration of priorities between such wells is contrary to the purpose of the plan, which is that the 1,892 single-family units will have substantially equal rights to water. Yet, with no issue presented or argued, we feel that we should not make a definitive ruling as to the water court's quoted statement.

■ In *Kelly Ranch* the conservancy district argued that the drainage from the leaching field or fields of one or more lots may adversely effect the quality of water withdrawn from a well serving another lot. No such argument has been presented here. Still the thought crosses our minds which may be linked to the last quoted statement of the water court: What if the 1,787 units having septic-soil absorption sewage systems are sold and residences constructed thereon and occupied, and it then develops that well water becomes polluted as a result of the many sewer systems with resultant health hazards? No one is here — nor can be here — representing the unknown, future purchasers of residential lots whose rights would be affected if our speculative assumption should become an actuality. We visualize that all we can do is to hold — and we do so rule — that possible adverse effects on the quality of well water as a result of the operation of the proposed residential development is not properly an issue here and nothing in this area has now become *res judicata.*

Generally the judgment is affirmed, but the cause is remanded with directions to modify the water court's findings, conclusions and approval of the plan in accordance with the views expressed in this opinion.