## No. 26884

**Kelly Ranch v. Southeastern Colorado Water Conservancy District and Division Engineer of Water Division No. 2**

(550 P.2d 297)

Decided June 1, 1976.                               Rehearing denied June 21, 1976.

Saunders, Snyder, Ross & Dickson, P.C., John M. Dickson, Jack F. Ross, for applicant-appellant.

Fairfield and Woods, Charles J. Beise, Howard Holme, for objectors-appellees.

Moses, Wittemyer and Harrison, P.C., for Glacier View Meadows, amicus curiae.

Mendenhall & Mendenhall, for "Numerous non-appearing water users in the central and lower Arkansas River Basin," amicus curiae.

Fischer, Brown, Huddleson and Gunn, for Cache La Poudre Water Users Association, amicus curiae.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This is a companion case to *Cache LaPoudre Water Users Ass'n v. Glacier View Meadows,* 191 Colo. 53, 550 P.2d 288 (1976), (hereinafter called *Glacier View Meadows*), announced contemporaneously with this opinion. *Glacier View Meadows* should be read in conjunction with

this opinion.

Kelly Ranch, a partnership composed of seven individuals, filed an application in the Water Court of Water Division No. 2 for approval of a "Plan of Augmentation Including Exchange and for Changes in Water Right Required for Operation of the Plan." The stated purpose of the plan is to provide a water supply through wells for the residents of three proposed subdivisions in the Buena Vista area. Kelly Ranch does not own any of the land in these subdivisions. The Southeastern Colorado Water Conservancy District (the District) filed an objection alleging that granting the application would result in injury to the District's water rights; and, further, that the plan would not produce water adequate to reimburse the Arkansas River system for the depletions caused by the subdivision use. The State Engineer approved the plan with slight modification, under Senate Bill No. 7, Colo. Sess. Laws 1974, ch. 111, 148-21-23 at 440,[1] finding that the plan would not injure the owners of vested or conditionally decreed water rights. The water court dismissed the application, finding that it was not properly a plan for augmentation. Kelly Ranch appealed. We reverse.

The application involves Kelly Ranch and the three proposed subdivisions. Two of the subdivisions, Freegold Hill Estates (35 lots) and River Rim Estates (17 lots) border the Arkansas River. Quail Ridge Subdivision (260 lots) lies two miles west of the river.[2] Kelly Ranch is two miles south of Buena Vista and about a mile from the river. Kelly Ranch consists of 444 acres irrigated with water represented by an 1874 water right. The applicant proposed to permanently remove from irrigation 14.04 acres of native pasture and to devote .31 c.f.s. of the 1874 priority that has been historically used to irrigate that acreage; and not to divert such .31 c.f.s. from the stream, thereby replacing the well water consumptively used. The 1874 water right historically has been diverted for irrigation 144 days per year. As the subdivision use of well water will be rather constant throughout the year, applicant proposed to store some of the water during the irrigation season and release it during non-irrigation times in order to prevent injury which would result from the year-around use.

Kelly Ranch has conveyed title to the .31 c.f.s. out of the 1874 decree to a trustee, Domestic Water Development Corporation, for the benefit of the eventual owners of the individual lots. According to a trust agreement between Kelly Ranch and the trustee, the trustee will be charged with: enforcing the applicant's obligation to remove the lands from irrigation; permitting a portion of the .31 c.f.s. to remain in the stream; storing and

---

[1]Now section 37-92-307, C.R.S. 1973 (Cum. Supp. 1975).

[2]The number of lots in the Quail Ridge Subdivision for which the applicant sought a water supply was reduced from 360 to 260 during the proceedings at the trial court level to meet certain requirements of the Chaffee County Planning Commission.

releasing water; and otherwise enforcing the decree.

The planned subdivisions, involving a total of 312 lots, are restricted to single-family dwellings, one dwelling per lot. The water is to be restricted to in-house use only, without any right to use the water for any purpose outside the house. Sewage disposal is to be restricted to non-evapotranspiration units, which in most instances will be leaching fields. Water delivered to the leaching fields, according to Kelly Ranch, will return to the stream. The buyer of any single lot would purchase a participation interest in the augmentation plan which he would present to the State Engineer, who would then be required to issue a well permit.[3]

Applicants arrived at an estimate of subdivision water use by using the State Engineer's criteria, which assumes that an average family would be composed of three and one-half persons who would require 100 gallons per person per day for a 365-day year.[4] These assumptions again were approved by the State Engineer. Thus, each household would be allotted 127,750 gallons of water to be withdrawn through wells, and delivered into it each year. The State Engineer approved the plan's assumption that there would be a consumptive use not exceeding 10% with the remainder returning to the stream.[5]

Multiplying the single-family consumptive use by the number of units planned, and then by reducing that amount to acre-feet, there will be an annual consumptive use of 16.069 acre-feet.[6] When this is then adjusted to account for evaporation and transportation losses, the annual consumptive figure becomes 16.139 acre-feet.

According to the State Engineer, the removal of 14.04 acres of pasture from irrigation would make a saving in consumptive use of irrigation water of 16.146 acre-feet per year.

The hearing in this matter commenced before the water court on February 27, 1974. It was recessed from time to time and ended on or about July 30, 1974. On May 7, 1974 Senate Bill No. 7 of the Colorado General Assembly was approved. Colo. Sess. Laws 1974, ch. 111 at 440. This was an amendment and addition to C.R.S. 1963, 148-21-23, which now appears as section 37-92-307, C.R.S. 1973 (Cum. Supp. 1975). Senate Bill

---

[3]As noted later in the opinion, the applicants proposed to eliminate the mandatory requirement that the State Engineer issue a permit under the proposed decree. However, this requirement was included in the original plan.

[4]These are the same standards as were approved in *Glacier View Meadows*, except there the gallonage was 80 instead of 100 gallons per day.

[5]According to objector's appendix filed herein, the State Engineer established the figure of 10% consumptive use as the criteria for use of exempt wells drilled under C.R.S. 1963, 148-21-45 (section 37-92-602, C.R.S. 1973).

[6]The figure of 16.069 is for 412 houses, whereas in fact the number of units has been reduced to 312, which would make the figure 12.17 acre-feet. The applicant has not sought to reduce the figure of 16.069 acre-feet. Thus, under applicant's plan the lands removed from irrigation could be — but have not been — reduced to 10.63 acres.

No. 7 added provisions which permitted a proposed temporary plan for augmentation to be submitted to the State Engineer and contains authority for the State Engineer to approve or reject such proposed plan. The statute further provides that the findings by the State Engineer with respect to the plan for augmentation "shall be prima facie evidence, unless challenged by competent countervailing evidence, of the facts upon which his determination was based."

The plan involved here was submitted to the State Engineer on May 10, 1974, under Senate Bill No. 7. He entered his approval of the plan on June 17, 1974, which approval was filed in the proceedings before the water court.

While the matter was before the State Engineer, he had before him a transcript of two days of the hearing before the water court, including all exhibits before the water court. Depositions were taken by the Deputy State Engineer, and later representatives of the State Engineer's office made inspections of the premises involved. Counsel for the District appeared at the taking of such depositions. From the records and briefs, we conclude that counsel for the District was advised in advance of all proceedings taken by the State Engineer, was present at all hearings conducted, and was given opportunity to submit evidence.

The court noted that the State Engineer signed a letter approving the plan as follows:
"FINDINGS:
"This office, having reviewed the plan of augmentation and other pertinent information, approves the plan as a temporary plan of augmentation conditioned upon the following revisions:
"1. The land to be removed from irrigation shall be the alfalfa hayland located in the NW 1/4 of the SE 1/4 of Sec. 29, T 14 S, R 78 W.
"2. The amount of land to be removed from irrigation shall be determined using the Modified Blaney-Criddle Method and shall consider not only the 16.068 acre-feet of water associated with the subdivision consumptive use, but also evaporation and seepage from the storage reservoirs.
"3. The two reservoirs shall be capable of storing and releasing to the Arkansas River the 8.0 acre feet of water associated with subdivision consumptive use that occurs during the period of no previous historic use of the Cottonwood and Maxwell Creek Ditch.
"4. The storage reservoirs will be equipped with measuring devices as required by the Division Engineer in order to administer the plan.
"If the above conditions are satisfied, this office finds that the plan of augmentation will provide replacement water in quantity and time so that no injurious effect will occur to another vested water right as a result of the three proposed subdivisions. Furthermore, there is no indication that this plan will violate the conditions of section 148-21-21(5) of the Colorado Revised Statutes."

## RULING BY THE WATER COURT

The court denied and dismissed the application, concluding that a plan for augmentation was not before the court because there was no addition of new water into the water system. More specifically the court stated:

"The proposal is not a 'plan of augmentation' under C.R.S. 1973 37-92-103(9). No new water is to be added to the river system, there being no 'augmentation' or increase, apparent. The proposal amounts to a change of point of diversion or change of water right under the provisions of C.R.S. 1973 37-92-103(5) and should be governed by the long-established rules applicable thereto."

Accordingly, the water court further ruled that the State Engineer erred in applying Senate Bill No. 7 to Kelly Ranch's proposal for the reason that the State Engineer's authority under that statute relates only to plans for augmentation. The court concluded that:

"The application is premised upon a theory of replacement of estimated consumptive use which would ignore the priority doctrine and which, if granted, would create a new class of water rights of developers exempt from the priority system and substitute in lieu thereof replacement of injury. No other water rights in the Arkansas River are so administered."

The court further held that section 37-92-602(2), C.R.S. 1973, relating to exempt wells, does not apply to a land-developer, but only to an individual applicant who seeks to obtain a water supply for his own use. It further ruled that:

"It would be improper for this court to pre-empt the administrative duties of the state engineer by prejudging applications under this section. The applicant as a promoter, speculator, and non-user, cannot obtain a decree — only a true appropriator can."

Prior to the foregoing rulings, the court made a number of findings which include several conclusions of law. We note a number of these, the first of which is:

"The Arkansas River is overappropriated all months of the year. Though the state engineer's finding is 'prima facie evidence' should it be determined that a 'plan of augmentation' is involved, the burden of proof is on the applicant to prove that the proposed plan will not injuriously affect the rights of junior or senior appropriators above or below the location for the proposed plan, and when a change from irrigation to domestic or municipal use is proposed, that change is limited to the historic usage of the irrigation right. Neither the time in which the water is used nor the volume of water diverted may be enlarged."

The court found that the water trust agreement provides for issuance of notices captioned "Notice of Participation in Plan of Augmentation." The notice when properly executed would then be used by the State Engineer as a basis for issuing well permits. The State Engineer, the court

found, would be *required* to issue the well permit by the applicant's proposed decrees "without further investigation."

The findings indicate that the evidence relative to the soil in the three subdivisions was conflicting. Although the evidence submitted there showed no impermeable layers or other conditions which would interfere with the amount of water which would return to the river's aquifer from Freegold Hill Estates or from River Rim Estates, there was evidence submitted to the court of such conditions related to the Quail Ridge property. As a consequence of that evidence, the court found that "the amount of water-return to the river's aquifer [from the Quail Ridge property] is subject to question."

The findings continue:

"There is probably water that can be reached by in-house wells at all times, but in case of error or abuse the damage will be borne by senior appropriators on the river. Water could be diverted by the household wells at any time during 365 days a year. Applicant's historic use of .31 c.f.s. is 144 days per year. Priority 53 [the 1890 decree here involved] has been called out of the river by senior appropriators in the past. The total non-irrigation season gross diversions by the wells could be at least 93.8 acre feet, assuming applicant's per capita use figures. If the state engineer's criteria are accepted 90% of such diversion used in River Rim and Freegold Hill Estates would return to the aquifer."

The trial court noted that the objector had been permitted to introduce evidence indicating that the quality of the return flow would be deteriorated, and that the ground water would not meet drinking water quality standards. Further, the court noted that the applicant produced expert testimony to show that the quality of the septic tank effluent would contain less objectionable water than effluent resulting from irrigation. The court stated, however:

"Since there is a question as to whether this court has jurisdiction to base a decision on this ground, no findings with regard thereto are made and this evidence is not now used as a determinative factor in this case."

The court held that, although restrictive covenants are provided, the plan did not provide for enforcement in the sense that it does not solve the problems of administration in insuring that no senior appropriator's rights will be damaged. It noted problems of manpower shortages in the State Engineer's office, and a question of measurement under a decree of "so small" an amount of water. It concluded that the wells requested would not be subject to the administration of the State Engineer; and that the rights of respective lot owners against other lot owners was undetermined.

Finally, the court concluded that although Kelly Ranch had, in accordance with the provisions of Section 37-92-305(3) and (4), C.R.S. 1973 filed proposed terms and conditions to prevent possibilities of injury to the district, the applicant had not proposed terms or conditions which would

cure the defects noted in the findings and conclusions.

## APPLICANT'S PROPOSALS

After the court made its oral findings, conclusions and rulings, and prior to placing these in a formal decree, the applicant made proposals, which may be paraphrased as follows:[7]

*Proposal A.* This was designed to solve the problem of the possible impermeable layers under parts of Quail Ridge Subdivision. It would require that no water be withdrawn from a well located in Quail Ridge after an impermeable layer of any type of material has been encountered above the water table in drilling the well.

*Proposal B.* This was suggested as a resolution of the court's concern as to enforcement under the subdivision covenants. The proposal would make the wells subject to administration, requiring the individual lot owners to waive any exemptions or presumptions to which the lot owner might otherwise be statutorily entitled under section 37-92-602, C.R.S. 1973. It would further require that the leaching fields within each subdivision be buried to a depth of at least 30 inches below the surface of the ground. Proposal B would further make any well users who violate the decree subject to all administrative and legal sanctions, including shut-down orders, and loss of well permit.

*Proposal C.* This would require the well user to file proof that individual leaching fields have been buried at least 30 inches or more below the surface of the ground.[8] The proof would be in the form of a certified copy of the Chaffee County Health Department Permit for Sewage Disposal System.

*Proposal D.* This makes the plan more definite in having storage of water not contemporaneously required for replacement during the irrigation season, such storage water to be released into the stream during the irrigation season.

*Proposal E.* This attempts to create a policing system at the expense of the well users by conditioning the withdrawal of water from a well upon an annual payment of $5.00 to the State Engineer for purposes of meeting the expenses incurred by that office in enforcement of the decree.

*Proposal F.* Here, there is to be set aside an amount of water, in addition to that already transferred to the trustee, and land in addition to the 14.04 acres. These are to be held subject to the court's further order for a period of five years, to meet unexpected consequences of the granting of the application.

*Proposal G.* This eliminates the mandatory requirement that the State Engineer issue permits.

---

[7]These were referred to in the formal decree, as mentioned in the preceding paragraph hereof.
[8]The water court had found some indecision as to this point in the applicant's evidence.

## I.

■ The fundamental question in the companion case of *Cache LaPoudre Water Users Ass'n v. Glacier View Meadows, supra*, and here, has been whether an acceptable plan for augmentation[9] requires the addition of new water into the water system, such as the introduction of trans-mountain diverted water into the system. In *Glacier View Meadows* one water court ruled that the addition of new water is not necessary, and here another water court has held that it is. We are affirming in *Glacier View Meadows* and reversing here. Under the circumstances of both cases new water need not be injected to give life and validity to a plan for augmentation.

■ As quoted from the statute in the companion case, this principle rests upon the legislative declaration and definition to be found in sections 37-92-102(1), 102(2), 102(2)(a), 102(2)(b), and 103(9), C.R.S. 1973. The policy of the state is there stated to be the integration of the appropriation, use and administration of tributary underground water with surface water, "in such a way as to maximize the beneficial use of all of the waters of this state." Under the legislative purpose the future welfare of the state depends upon a sound and flexible integrated use of all water. A plan for augmentation, statutorily, means a detailed program to increase the supply of water by the development of new or alternate means or pooling of water resources "by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means."

■ In *Fellhauer v. People*, 167 Colo. 320, 447 P.2d 986 (1968), decided prior to the adoption of the statute just quoted, we said, "As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights*." Later in *Hall v. Kuiper*, 181 Colo. 130, 510 P.2d 329 (1973), we mentioned dreams and hopes that future technology would provide new methods under the doctrine of maximum utilization. Perhaps there does not exist here or in the companion case very much new technology, but the innovations of the applicants in both cases fall into the general pattern which we contemplated in *Fellhauer*.

These legislative and judicial declarations constitute the foundation upon which the super-structure of these particular plans for augmentation are built. The basic plan as here visualized by Kelly Ranch, as well as that of the applicant in the companion case, is consonant with the stated purposes to be achieved, and is valid. The fact that the rivers involved are over-appropriated, rather than being an argument against the plans, is the

---

[9]Under C.R.S. 1963, 148-21-18, as amended, now section 37-92-302, C.R.S. 1973.

very reason for the valid exercise of ingenuity of persons seeking to maximize the use of water, whether they are present or future owners of land and wells, developers, or, as characterized by the water court here, promoters, speculators or non-users.

## II.

■ Here, the water court treats the plan for augmentation as it would any decree for a diverted right, *i.e.*, the full amount diverted must be placed in the sequence of priority behind senior rights. Thus, the water court has reasoned that in this particular plan for augmentation one cannot consider merely the consumptive uses. We hold to the contrary and to the effect that, under the facts here, the court should consider and make allowance for return flows involved.

We now proceed to comment on most of the other issues raised.

## III.

The District objected to the application of Senate Bill No. 7 for the reason that, since it was adopted after hearings commenced in this matter, it should not be used to cast a presumption of validity of the plan for augmentation as a result of the approval of the plan by the State Engineer. Secondly, the District argues vigorously that Senate Bill No. 7 violates due process by not affording interested persons appropriate notice of proceedings and action to be taken by the State Engineer. We agree with the District as to its first objection, and do not reach the second point.

■ While the District made a timely and adequate objection, neither side argued as to the effect of Senate Bill No. 7 from the fact that the Act was approved after the hearings commenced. We have concluded that there is a fundamental unfairness in applying the presumptive effect of Senate Bill No. 7 in the light of the fact that that Bill was enacted after the hearings commenced in the water court. By "presumptive effect" we mean that portion of the act which specifies that, when the State Engineer has approved a temporary plan for augmentation, his findings "in support of such determination shall be prima facie evidence, unless challenged by competent countervailing evidence. . . ." We feel, and rule, that the findings and other materials submitted by the State Engineer may be considered by the court along with other evidence, but the presumption creating a *prima facie* case should be only in proceedings in which the court hearings commence after the adoption of Senate Bill No. 7.

The disposition of an application for approval of a plan for augmentation can well turn on whether the presumption created by Senate Bill No. 7 is in effect. With the elimination of the establishment of a *prima facie* case by the State Engineer's approval of a proposed plan for augmentation, we deem it unnecessary to reach the argument of unconstitutionality of the statute made by the District. This argument is predicated upon alleged violation of due process by reason of lack of notice to interested persons of proceedings and actions to be taken before and by the State

Engineer. The argument continues that, in the absence of provisions for adequate notice of the State Engineer's proceeding and with the possible result of his act of approval of the plan presenting the application with proof of a *prima facie* case, Senate Bill No. 7 is facially unconstitutional as a violation of due process. Since the presumptive effect of the statute has been removed, this is not a case for us to reach the question of facial unconstitutionality. In the absence of intervening legislative amendment as to notice, we well may have to cross that bridge some future day.

Further, it is to be observed that counsel for the District had actual notice of, and participated in, all proceedings of the State Engineer.

## IV.

The water court concluded that "under existing law domestic in-house use is not subject to administration by the state engineer." Undoubtedly, here the court refers to wells which are statutorily exempt from administration. Section 37-92-602, C.R.S. 1973. In Proposal B of Kelly Ranch, the owner of each lot would be required to waive any exemption or presumption to which he might be entitled under the statute just cited. In contrast to either view, we ruled in *Glacier View Meadows* — and here rule — that all wells involved in such a plan as we have before us must be treated as if they were non-exempt.

## V.

The findings and conclusions of the water court are to the effect that the proposed plan for augmentation must fail, among other reasons, because under it there is no need for a "true appropriator," and because the State Engineer is robbed of his prerogatives and judgment with respect to the issuance of well permits. In other words, the court had the concept that, if the plan for augmentation were approved, the State Engineer would be obliged to act as a robot in issuing well permits thereunder.

We had the identical issues in the companion case and here, in effect, repeat what we said there. A "true appropriator" is not required under a proposed plan for augmentation such as this one. After a plan has been approved, there must be applications for all well permits addressed to and granted by the State Engineer in order for the wells to be constructed under section 37-90-137, C.R.S. 1973. It is true that approval of the plan eliminates certain things from consideration by the State Engineer upon an application for a well permit under the plan, but there are remaining other responsibilities of the State Engineer under the statute just cited. Further, we visualize that, after some wells have been constructed and are operable, on subsequent applications for wells under the plan, the State Engineer among other things may consider whether the plan actually is operating as contemplated and decreed.

## VI.

Here the court ordered that there be paid in advance the court's docket fee, including $5 for the second well and $5 for each subsequent

well contemplated by the plan. As a result, Kelly Ranch was obliged to pay under protest the sum of $2,045, being the docket fees for second and subsequent wells. In *Glacier View Meadows* the court required the payment only of the initial docket fee for filing the plan in the amount of $25, and ruled that the $5 per-well filing fee be paid subsequently at the time each permit for a well issued from the State Engineer's office. We approved the water court's ruling in *Glacier View Meadows* and, by the same token, disapprove the ruling with respect to docket fees here. Kelly Ranch is entitled to reimbursement of the sum paid under protest.

## VII.

As stated earlier in the opinion, there was evidence of impermeable layers lying within the Quail Ridge property. As a consequence, the court found that the amount of return flow from the water used from wells to be drilled on the Quail Ridge property was "subject to question." In other words, the court found itself unable to make a finding as to the amount of return flow resulting from in-house use of water from wells in that subdivision.

Also, as already stated, Kelly Ranch in its Proposal A would require that no water be withdrawn from a well in the Quail Ridge Subdivision "where an impermeable layer of any type of material has been encountered above the water table *in drilling such well.*" (Emphasis added.)

■ As we view the purpose and intent of the General Assembly in adopting the statutes under consideration — and we so rule — the burden is upon the proponent of a proposed plan for augmentation to prove the amount of return flow from in-house use of water withdrawn from wells on the property, and the result may be that a court will conclude that such return flow is 90%, 50% or nothing, or some percentage in between. If Kelly Ranch does not prove to the satisfaction of the court that there is any return flow from such use in the Quail Ridge Subdivision, then the court will be obliged to order release into the stream of 100% of the amount of water withdrawn from such wells from which there is no return flow.[10]

The problem before the water court is not solved by Proposal A. Failure of return flow does not depend upon "an impermeable layer . . . encountered above the water table in drilling such well," as suggested in Proposal A. Rather, the question is whether there are impermeable layers in or below the non-evapotranspiration unit involved which prevent or impede return flow.

The water court has ruled, or at least indicated strongly, that the present evidence does not justify a finding of the extent of return flow in

---

[10]In some subsequent, similar proceeding, the proponent of a plan for augmentation may have the benefit of establishing a *prima facie* case for return flow under Senate Bill No. 7; but not here.

the Quail Ridge Subdivision. Although the present water judge after remand may use the evidence already submitted, it appears that here is one instance, which may be among several, in which the court should permit the taking of further evidence. We speculated earlier as to whether the water court, in the light of our fundamental holding here, might view its other findings and conclusions in a different light. By the same thought process we reach the conclusion that the water court well may need to take additional evidence as to certain matters. In this particular, the water court should exercise rather wide discretion.

## VIII.

We mentioned earlier in this opinion that the water court mentioned the matter of deterioration of the quality of return flow, but, as the court had a question as to its jurisdiction to base a decision on quality, it made no finding. We quote further from the water court's findings:

"Over applicant's objection the opponent was permitted to introduce evidence indicating that the common type of sewage treatment systems, septic tanks and leaching fields lead to the worst quality of return flow, since they do not treat nitrates, organics or phenols, and the quality of the ground water would deteriorate from the proposed plan. In addition it was contended that in the River Rim Subdivision, being located between the leaky Buena Vista sewage lagoons and the Arkansas River, in the opinion of at least one expert, the ground water would not meet drinking water quality standards. Applicant produced expert testimony to the effect that the quality of septic tank effluent contained less objectionable water quality than effluent resulting from irrigation. Since there is a question as to whether this court has jurisdiction to base a decision on this ground, no findings with regard thereto are made and this evidence is not now used as a determinative factor in this case."

In its brief, and more particularly in oral arguments, counsel for the District emphasized its concern about unsanitary conditions created by the withdrawal from a well of water consisting of the return flow of effluent after it had passed through leaching fields.

It is provided by statute with respect for augmentation that "[a]ny substituted water shall be of a quality and quantity so as to meet the requirements for which the water of the senior appropriator has normally been used. . . ." Section 37-92-305(5), C.R.S. 1973. The District's argument is not that the plan will injuriously affect its users, but rather that the pollution will be harmful to the now unknown future owners of lots in the subdivisions. This issue does not affect the present parties and therefore does not come within our contemplation. As a result, we need not reach the determination of the effect of the statute just cited nor the soundness of the water court's conclusion that it might not have jurisdiction to consider quality.

The matter of pollution of a well in the subdivision by the return flow from another well in the subdivision is an issue not properly in this proceeding. We decline to surmise whether such an issue properly should first arise in a court or in the Executive Branch under its sanitary authority. We leave in a similar undecided state the matter of leaching field depth.

IX.

In its findings, the water court stated that Kelly Ranch's Priority No. 53 "has been called out of the river by senior appropriators in the past." This statement was made in connection with the court's ruling that all water withdrawn from wells should be placed in the priority system, inferior to senior appropriators. Our view as to this statement is the same as that we expressed in the companion case, wherein we considered the possibility that a drought may cause insufficient water to be available for replacement. We there said that "the well water users will be obliged to acquire additional water by lease or otherwise, or else to reduce their consumptive use, to the end that water consumptively used under the plan will not exceed that available for replacement." The same principle and rule applies here in the event that a valid call is made upon the water adjudicated to the 14.04 acres.

X.

We give short shrift to the argument, mentioned in the water court's ruling, that the plan should not be approved by reason of manpower shortages in the State Engineer's office, or by reason of the amount of water to be measured being "so small." These, we submit, are not problems for the judiciary, but are rather for the Executive Branch in general and the State Engineer in particular, and for the General Assembly.

XI.

Here, as in *Glacier View Meadows*, the problem of uncertainties was addressed to us. In the companion case we quoted from the water court's findings. That quotation is worthy of reiteration here:

"Inherent in the hydrological and geological analysis upon which the plan for augmentation herein is founded, is a degree of uncertainty, but the uncertainty is no greater than that inherent in the administration of water rights generally and is not of great significance. The assumptions upon which the plan is based allow more than adequate latitude. If the plan for augmentation is operated in accordance with the detailed conditions herein, it will have the effect of replacing water in the stream at the times and places and in the amounts of the depletions caused by the development's use of water. As a result, the underground water to be diverted by the development wells, which would otherwise be considered as appropriated and unavailable for use, will now be available for appropriation without adversely affecting vested water rights or decreed conditional water rights on the [river] or its tributaries."

## XII.

■ Questions have been raised as to the adequacy of the trust agreement and of covenants running with the land thereunder so far as the provisions of the agreement may relate to enforcement of the plan or to any other essentials of the plan. It appears that as yet the water court has not gone into these problems in depth, and that it should do so. One of the tasks of the water court is to point out the defects in the trust agreement and other component parts of the plan, so that Kelly Ranch can have an opportunity to remedy them. Sections 37-92-305(3) and (4), C.R.S. 1973. This is the responsibility of the water court, and, again, it may conclude that further evidence in the matter is necessary. If the plan is feasible, the underlying and overriding purpose of the courts is to attempt to make it workable.

## XIII.

■ Proposal F, summarized earlier, would set aside an additional amount of water to the trustee, would have Kelly Ranch obligated to cease irrigation of the land to which such additional water has been allocated, and would have the court retain jurisdiction for five years with respect to such additional water and land. As long as Kelly Ranch makes the offer, from our vantage point we see no reason why it should not be accepted. We are concerned, however, lest any retention of jurisdiction prevent review of any of the water court's order which would be reviewable except for such retention. The availability of review must be retained.

The judgment is reversed and the cause remanded with directions that the water court proceed consonant with the views expressed in this and the companion opinion.