829

PUBLIC SERVICE COMPANY OF COL-
ORADO, a Colorado Corporation, Ob-
jector–Appellant,

v.

WILLOWS WATER DISTRICT,
Applicant–Appellee,

and

Alan D. Berryman, Division Engineer
for Water Division No. 1,
Objector–Appellee.

No. 92SA304.

Supreme Court of Colorado,
En Banc.

July 26, 1993.

**830**

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Chad M. Neuens, Denver, for objector-appellant.

Saunders, Snyder, Ross & Dickson, P.C., David C. Hallford, Carmen M. Sower, Denver, for applicant-appellee.

Fairfield and Woods, P.C., Howard Holme, Stephen H. Leonhardt, Denver, amicus curiae for Southeastern Colorado Water Conservancy Dist.

Krassa, Lindholm, Kumli & Madsen, Robert F.T. Krassa, Karl F. Kumli, III, Robin A. Byers, Boulder, amicus curiae for Parker Water and Sanitation Dist.

White & Jankowski, Michael D. White, Scotty P. Krob, Bruce D. Bernard, Austin C. Hamre, Denver, amicus curiae for City of Thornton.

Duncan, Ostrander & Dingess, P.C., John M. Dingess, J. Andrew Ausmus, Denver, amicus curiae for City of Aurora.

Fischer, Brown, Huddleson & Gunn, P.C., Howard H. Brown, Fort Collins, amicus curiae for Cache La Poudre Water Users Ass'n.

Michael T. Mitchell, Parker, amicus curiae for Arkansas Valley Ditch Ass'n.

Carlson, Hammond & Paddock, William A. Paddock, Melanie Kopperud Backes, Denver, Gregory L. Johnson, Asst. City Atty., Colorado Springs, amicus curiae for City of Colorado Springs.

Justice MULLARKEY delivered the Opinion of the Court.

The Objector–Appellant, Public Service Company of Colorado (Public Service), appeals from a judgment and decree of the District Court, Water Division 1 (water court) granting an application by the Willows Water District (Willows) for an augmentation and reuse program for non-tributary ground water to recapture return flows resulting from the use of the water for irrigation purposes. We conclude that the water court did not err when it concluded that Willows distinguished the volumes of underground return flows of the nontributary ground water in terms of timing, location, and amount; that Willows retained "dominion" of the water after it had been used by district residents for domestic irrigation use; and that the evidence supports the water court's finding of non-injury. We also conclude that Public Service did not properly raise or preserve its evidentiary objection to the admission of Willows' engineering report. Accordingly, we affirm the order of the water court.

I.

Willows is a water district organized in 1973, comprising about 1,800 acres south of Denver. It is generally bounded by Que-

bec Street on the east, Holly Street on the west, Arapahoe Road on the north, and County Line Road on the south. Willows serves approximately 4,800 single family equivalent taps, and the land is used generally for residential purposes. The district has been essentially "built-out" since 1986 or 1987. Willows is entirely within the Little Dry Creek watershed, which runs southeast to northwest through the district, and which is tributary to the South Platte River.

Willows has two sources of water: nontributary groundwater, which it has been pumping since 1974 (Willows water), and interruptable contract deliveries from the Denver Water Department since 1982 (Denver water). At the time of trial, Willows water supplied approximately sixty percent of the water service provided to Willows' customers, and Denver water provided forty percent. In 1986, Willows authorized an engineering analysis of the return flow in the district. This analysis demonstrated that approximately ten percent of water applied for irrigation in the district accrues to Little Dry Creek. Willows plans to drill three wells in the tributary alluvium of Little Dry Creek within the "affected stream reach." The wells would pump alluvial ground water in amounts equal to reusable return flows attributable to Willows water (or roughly 0.4 percent of the total water supplied by Willows to its customers, amounting to 200 or less acre-feet per year) used for irrigation purposes so that any depletions to Little Dry Creek and the South Platte River will be fully augmented.

On December 19, 1990, Willows submitted applications to the State Engineer for permits to build and operate the three proposed wells. The applications were denied because no augmentation plan had been approved by the water court. An application for the approval of such an augmentation plan, however, was then pending in the water court, having been filed September 28, 1990. Statements of opposition were filed by Public Service, the State Engineer and the Division Engineer for Division 1, the City and County of Denver through its Board of Water Commissioners, and Centennial Water and Sanitation District. The application was referred to the Water Referee, but subsequently was re-referred to the water court pursuant to section 37–92–303(2), 15 C.R.S. (1990).

By stipulation, the oppositions of the State and Division 1 Engineers, the City and County of Denver, and Centennial Water and Sanitation District were eliminated, leaving Public Service as the sole objector. The case was tried on June 11, 1992. At the close of trial, the water court found that Willows had met its burden under section 37–92–305(3) and (8), 15 C.R.S. (1990) and entered the proposed decree, which had been prepared by Willows prior to trial, authorizing Willows' reuse of a maximum of 200 acre-feet of water annually.

Public Service appealed the decision of the water court. We affirm.

## II.

Public Service, in its appellate brief, summarily argues that Willows' engineering expert witness' opinion testimony did not meet the test for admission of scientific opinion testimony set out in *Frye v. United States*, 293 F. 1013 (D.D.C.1923).[1] At trial, there was no objection to the testimony of Willows' engineering expert. "An issue is not properly preserved for appellate review if, as here, it is not presented to the trial court and is raised for the first time on appeal." *People v. Lesney*, 855 P.2d 1364 (Colo.1993); *see also Colgan v. Department of Revenue*, 623 P.2d 871, 874 (Colo. 1981); *Manka v. Martin*, 200 Colo. 260, 264, 614 P.2d 875, 877 (1980). We decline to address the issue of whether the methods used by Willows in its engineering study were scientifically reliable or whether Willows' expert's opinion testimony was incompetent and inadmissible.

1. While we recently reaffirmed the validity of the *Frye* test for certain circumstances in Colorado in *Fishback v. People*, 851 P.2d 884 (Colo. 1993), *but see id.* at 896 (Mullarkey, J., concurring in the result), the validity of the *Frye* test recently was rejected by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

### III.

Public Service properly presents three issues for this court to decide, the latter two of which are interrelated.[2] The first is whether, by accounting for and calculating but not measuring or metering return flows of Willows water into the Little Dry Creek system, Willows has "dominion" over the return flows, or whether Willows is required to physically contain and meter such return flows in order to establish dominion over them. *See* § 37–82–106(2), 15 C.R.S. (1990).[3] The second is whether Willows can "distinguish" the volumes of Willows water return flows in terms of timing, location, and amount from the stream into which they are introduced. *See* §§ 37–82–106(1)[4] & 37–92–305(8),[5] 15 C.R.S. (1990). The third issue, which is related to the second issue before us, is whether the evidence was sufficient to support the water court's finding that the augmentation plan would not injure other water rights in the South Platte River system. *See* § 37–92–305(3)[6] & (8), 15 C.R.S. (1990).

### A.

Public Service argues that, because the Willows water sought to be reused is used

**2.** The issues as listed by Public Service in its disclosure statement to the water court were:
 1. Whether the Applicant's accounting system constitutes "dominion and control" over the calculated return flows such that it may reclaim and reuse a certain amount of water without regard for the priority system.
 2. Whether the legal concept "dominion and control" connotes actual physical control in a pipe or discrete means of conveyance as opposed to a hypothetical calculation.
 3. Whether the Applicant can accurately forecast the timing and amount of return flow in order that its proposed reuse program can be administered.

**3.** Section 37–82–106(2), 15 C.R.S. (1990) provides:
 (2) To the extent that there exists a right to make a succession of uses of foreign, nontributary, or other developed water, such right is personal to the developer or his successors, lessees, contractees, or assigns. *Such water, when released from the dominion of the user, becomes a part of the natural stream where released, subject to water rights on such stream in the order of their priority,* but nothing in this subsection (2) shall affect the rights of the developer or his successors or assigns with respect to such foreign, nontributary, or developed water, nor shall dominion over such water be lost to the owner or user thereof by reason of use of a natural watercourse in the process of carrying such water to the place of its use or successive use. [emphasis added].

**4.** Section 37–82–106(1) provides:
 (1) Whenever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of water by exchange or otherwise to the extent that its volume can be distinguished from the volume of the streams into which it is introduced. Nothing in this section shall be construed to impair or diminish any water right which has become vested.

**5.** Section 37–92–305(8), 15 C.R.S. (1990) provides:

 In reviewing a proposed plan for augmentation and in considering the terms and conditions which may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water which would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right. A plan for augmentation shall be sufficient to permit the continuation of diversions when curtailment would otherwise be required to meet a valid senior call for water, to the extent that the applicant shall provide replacement water necessary and to the extent the senior would be deprived of his lawful entitlement by the applicant's diversion. Decrees approving plans for augmentation shall require that the state engineer curtail all out-of-priority diversions, the depletions from which are not so replaced as to prevent injury to vested water rights.

**6.** Section 37–92–305(3), 15 C.R.S. (1990) provides:

 (3) A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. In cases in which a statement of opposition has been filed, the applicant shall provide to the referee or to the water judge, as the case may be, a proposed ruling or decree to prevent such injurious effect in advance of any hearing on the merits of the application, and notice of such proposed ruling or decree shall be provided to all parties who have entered the proceedings. If it is determined that the proposed change or plan as presented in the application and the proposed ruling or decree

by Willows' customers for irrigation purposes and the water is not under the physical control of Willows after such irrigation use, Willows has lost "dominion" of that water.[7] Public Service proposes, without citation of any applicable or persuasive authority, that this court adopt a definition of "dominion" which limits dominion to direct physical control over water. Public Service would require physical control, apparently by means of pipes or other devices, and direct measurement of the water by some metering device. We refuse to adopt such a restrictive definition.

■ In *City and County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972), Denver sought to make successive uses of transmountain water while in its dominion.[8] There, the objectors claimed and the water court concluded that Denver lost dominion of the water either when the water left the customer tap or, at the very latest, when the water was delivered to the sewer intake line. This court reversed, holding that Denver did not lose dominion over the water later returning to its sewer system by abandoning the water when it was delivered to a customer tap.[9]

■ Public Service suggests that the rule to be derived from *Fulton* is that dominion is maintained when water flows from the tap to the customer and thence to a sewage system.[10] Therefore, Public Service maintains that Willows loses its dominion over Willows water once it is used for irrigation purposes. However, dominion, as noted (but not recognized) by Public Service in its opening brief, is not limited to actual physical control, but extends to the *right* to control, possession, and use.

■ We did not hold in *Fulton* that, after the water leaves the customer tap, the water must return immediately to the physical control of the entity that imported the water into the stream system. A customer in *Fulton* could fill a swimming pool or a pond, or spray the water onto his or her lawn, or spill it into the street. Denver had the right to reuse the water because it had the ability and the intent to recapture the water after it was used by a customer, regardless of the time elapsed between delivery and recovery. Similarly, Willows, in 1986, began to plan to recapture Willows water used for irrigation purposes. The present application for augmentation is merely the culmination of that effort.

We conclude that Willows, at least beginning in 1986 or 1987, manifested an intent to recapture irrigation return flows of Willows water into Little Dry Creek, and did not relinquish dominion over the water when it left customer taps. Instead, Willows performed a lysimeter[11] study to eval-

---

would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

7. Amicus curiae the City of Thornton urges this court not to consider the question of "dominion," arguing that it is not properly before the court. Although Public Service's arguments regarding "dominion" and "distinguishing" are perhaps a bit confused, the facts of this case do present the issues of what is and is not dominion in this fact context.

8. An appropriator of native, tributary water, which historically flows back to the stream from whence it comes, is permitted only one use of the water because the return flows are subject to water rights on the stream in the order of their priority. By contrast, the owner of a water right which has been imported into a stream system has the right to successive reuse, to extinction, of the water. *City of Florence v.*

*Board of Waterworks of Pueblo*, 793 P.2d 148, 154 (Colo.1990).

9. *Fulton* was decided prior to the enactment of section 37–82–106, 15 C.R.S. (1990). *See supra* footnotes 3 and 4.

10. Two amici, The Arkansas Valley Ditch Association, and the Cache La Poudre Water Users Association, have also cited cases regarding reservoir seepage where we held that such seepage cannot be recaptured. *See, e.g., Fort Morgan Reservoir & Ditch Co. v. McCune*, 71 Colo. 256, 206 P. 393 (1922). These cases, however, dealt with native, tributary water, not with nontributary or other water which was foreign to the watershed. *See supra* note 3.

11. A lysimeter is a device for measuring the percolation of water through soils and determining the soluble constituents removed in the drainage. *Webster's Third New Int'l Dictionary* 1351 (1986). A diagram of a lysimeter is attached as Appendix A to this opinion.

uate and quantify the volume of Willows water percolating below the grass root zone and returning to the Little Dry Creek stream system. This study allowed Willows to quantify the stream flow accretions that result from lawn irrigation within the boundaries of the district. Willows did not lose dominion of Willows water when the water was used by its customers for lawn irrigation.[12]

## B.

■ The second and third questions are whether Willows has distinguished Willows water from the natural stream, and whether the evidence supports the water court's finding of non-injury to other holders of water rights on Little Dry Creek and the South Platte River drainage. These two questions are interrelated.[13] If the water Willows plans to pump as return flow is its nontributary groundwater, then there can be no injury to other rights holders. This is because, as we noted in *Fulton*, "appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed." 179 Colo. at 53, 506 P.2d at 147 (quoting *Brighton Ditch Co. v. Englewood*, 124 Colo. 366, 377, 237 P.2d 116, 122 (1951)). One who brings water to a watershed has no duty to those downstream users of his or her return flows to continue to bring that water into the watershed. *Id.* 179 Colo. at 54, 506 P.2d 144 (citing Samuel C. Wiel, *Mingling of Waters*, 29 Harv.L.Rev. 137 (1915)).

■ Willows' expert testified regarding the engineering study performed on behalf of Willows. Willows keeps records of how much of its own nontributary ground water it uses, and how much Denver water it uses. Willows realized that Willows water was being used for residential irrigation purposes (which, under the engineering study's assumptions, was the average of the difference of the water used during irrigation season and that used during the non-irrigation season, which was deemed to be used for household purposes), and that the return flows from this irrigation could be reused if these return flows could be distinguished from the natural flows of the Little Dry Creek stream system, i.e., quantified volumetrically. *See Fulton*, 179 Colo. at 58, 506 P.2d at 158. By determining the difference in demand for water between the irrigation season and the non-irrigation season, Willows' expert estimated how much water was being used for irrigation. The methodology used by Willows' expert in performing the studies was developed by Cottonwoods Water and Sanitation District in conjunction with the State Engineer's office, to determine the amount of underflow passing the root zone by using lysimeters. The engineering study (which was also entered into evidence without objection) showed that ten percent of the water used for lawn irrigation purposes accrues to the stream. Furthermore, Willows' expert testified that the system (the district, the stream, the water use, and the water accruing to the stream) is in steady state, so that annual (or even daily) fluctuations are not expected.[14] *Cf. State Engi-*

---

12. Our rejection of Public Service's position that dominion means physical control of the water in a pipe or other discrete means of conveyance is further supported by the language of section 37–82–106(2), which provides that an owner of nontributary groundwater can use a natural water course to transport water without losing dominion over it. Underground water hydraulically connected to a surface stream is part of a natural stream. § 37–92–103(11), (13), 15 C.R.S. (1990).

13. In fact, it appears that distinguishing water brought into a natural drainage from another drainage or from nontributary groundwater wells under a plan for augmentation is synonymous with non-injury in this context.

14. Willows' expert explained the meaning of "steady state condition" as it relates to the time when water returns to the stream at trial as follows:

Well, essentially, you will set up a pattern whereby water will be coming back in a pattern that will be repeated year after year. In other words, it's a condition where—once the flow pattern has been set up and has reached the stream, then you've essentially reached a steady state condition where that water continues to come back. And it will come back on a yearly basis, it won't just come back in the summertime. That's based on distances to the stream.... And you can show that those flows will be coming back all times of the year.

*neer v. Castle Meadows, Inc.,* 856 P.2d 496 (Colo.1993) (timing of urban runoff, in contrast to alluvial migration, is "fluctuating and unpredictable").

Public Service's objections, with regard to these issues, are addressed more to the methodology used by Willows to calculate the return flows and the weight placed on the evidence by the water court, than to any real failure to produce evidence. On cross-examination, Public Service's engineering expert witness was asked his opinion whether lysimeter information can be reasonably accurate. He responded, "In some applications it can be reasonably accurate. Where there's a potential for injury to other water rights such as in this application, I just don't see it being reasonably accurate." This was after the same expert had testified on direct examination that lysimeter studies may be the best method available. Therefore, it appears that Public Service's expert simply did not believe that the method used by Willows to distinguish its nontributary groundwater from that of Little Dry Creek was good enough to be used to support a plan for augmentation to reuse that water. Public Service, however, did not object to the scientific reliability or the admissibility of Willows' evidence. Public Service's expert also testified that he did not believe that Willows had proven that any water was accruing to Little Dry Creek (as its name implies, historically an intermittent stream, but presently a perennial stream in the affected stream reach), despite the stipulation of the parties, including Public Service, that Little Dry Creek's surface stream flows within the area of Willows had increased in amount and duration subsequent to development in the area as a result of urbanization in and upstream from the area. The water court was not in error to admit and to find Willows engineering evidence more credible and persuasive than that of Public Service.

It is true that the method used by Willows and its engineering expert in determining the return flows depends on estimates, assumptions, and rules of thumb. Public Service, however, offered no concrete evidence as to the possible magnitude (or direction) of error created by this inexactness. Instead, Public Service, without having made an evidentiary objection before the trial court, asks this court to deem Willows' evidence incompetent. This we will not do. *See supra* part II.

 While there may be some uncertainty in these facts found by the water court, and while this court, had it been the finder of fact, may not have made the same findings, the findings are supported by the record. We, therefore, will not disturb the water court's findings. The water court's findings of fact support the conclusion that the proportion of water sent to customer taps from Willows water is the same as the proportion of alluvial groundwater sought to be pumped as return flows. The water court concluded that Willows had measured and accounted for the return flows, imperfectly, and with many assumptions, but to a preponderance of the evidence. Uncertainties, however, are not fatal to a plan for augmentation. *Cache La Poudre Water Users Ass'n v. Glacier View Meadows,* 191 Colo. 53, 63, 550 P.2d 288, 295–96 (1976); *Kelly Ranch v. Southeastern Colorado Water Conservancy Dist.,* 191 Colo. 65, 79, 550 P.2d 297, 308 (1976).[15] The

Willows' engineering expert admitted that water accruing to the stream could take from one or two months up to as long as five years to reach the stream because the houses are at varying distances from the surface stream. Because the residential development was built out in 1986, this time differential is irrelevant. Furthermore, the facts of this case are that Willows water has been released into the stream system since 1974, and Willows seeks to pump return flows on the basis of Willows water used five years prior to the year in which it wishes to pump water. "With the question of quality not involved, ... water is fungible or is to be treated the same as a fungible article. The particles of water do not have to be identified as coming from [Willows' wells], but rather water ... can be divided volumetrically." *Fulton,* 179 Colo. at 58, 506 P.2d at 150.

15. The water court, in *Glacier View Meadows,* stated:

Inherent in the hydrological and geological analysis upon which the plan for augmentation herein is founded, is a degree of uncertainty, but the uncertainty is no greater than that inherent in the administration of water

water court's conclusion that Willows distinguished its water from that of the stream is supported by the evidence and will not be disturbed on appeal.

The water court's conclusion that the augmentation plan would not cause injury similarly is supported by the evidence.[16] Willows bore the burden of showing the quantity, timing, and location of the return flows. While none of these was done with mathematical precision, Willows showed that ten percent of water used for lawn irrigation accrued to the stream, that the accrual was relatively steady over time, and that the flows returned to the stream in a discrete, defined area. The water

court's finding is supported by the evidence and will not be disturbed on appeal.

## IV.

To conclude, Willows did not lose dominion of nontributary groundwater used for irrigation purposes within the Little Dry Creek basin when it was used by its customers. The water court's conclusions that Willows had distinguished the water from the stream, and that Willows had proven non-injury to other holders of water rights in the basin and on the South Platte River were supported by the evidence. We affirm the judgment of the water court.

---

rights generally and is not of great significance. The assumptions upon which the plan is based allow more than adequate latitude. If the plan for augmentation is operated in accordance with the detailed conditions herein, it will have the effect of replacing water in the stream at the times and places and in the amounts of the depletions caused by the development's use of water. As a result, the underground water to be diverted by the development wells, which would otherwise be considered as appropriated and unavailable for use, will now be available for appropria-

tion without adversely affecting vested water rights or decreed conditional water rights on the South Platte River tributaries.
191 Colo. at 63, 550 P.2d at 296. This statement is as applicable today, in this case, as it was in 1976, in *Glacier View Meadows*.

**16.** We note also that the water court has retained jurisdiction of this case for the purpose of reconsidering the question of injury to the vested rights of others.

# APPENDIX A

NATURAL GROUND SURFACE

SOD COVER

SILICONE SEAL BETWEEN METAL RING AND LYSIMETER

NATIVE SOIL

12-3/8 INCH O.D. PVC LYSIMETER

~3 FT.

MIRAFI FILTER FABRIC

12-1/2 INCH DIAMETER METAL RING

3/8 INCH PEA GRAVEL DRAIN

DRAIN PLUG