Harold D. SIMPSON, State Engineer, and Alan D. Berryman, Division Engineer, Water Division 1, Opposers–Appellants,

v.

YALE INVESTMENTS, INC. (f/k/a Castle Meadows, Inc.), Applicant–Appellee,

and

City of Englewood, Sanford Homes, Castleton Center Water and Sanitation District, Bellemah Community Development, Atchison, Topeka and Santa Fe Railway Company, Mission Viejo Company, Highlands Ranch Development Corp., Castle Pines Metropolitan District, Castle Pines North Metropolitan District, C.P. Commercial Properties, Inc., and Parker Water and Sanitation District, Opposers–Appellees.

Harold D. SIMPSON, State Engineer, and Alan D. Berryman, Division Engineer, Water Division 1, Opposers–Appellants,

v.

CASTLE PINES METROPOLITAN DISTRICT, Castle Pines Land Company, the Friedkin Companies, and Friedkin Investments, Inc., Applicants–Appellees,

and

City of Englewood, and Centennial Water and Sanitation District, Opposers–Appellees.

Nos. 93SA310, 93SA311.

Supreme Court of Colorado, En Banc.

Dec. 19, 1994.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Patricia S. Bangert, Deputy Atty. Gen., Jennifer L. Gimbel, First Asst. Atty. Gen., Peter A. Fahmy, Asst. Atty. Gen., Natural Resources Section, Denver, for opposers-appellants State and Div. Engineers.

Holly I. Holder, P.C., Holly I. Holder, Priscilla S. Fulmer, Denver, for appellants-appellees Yale Investments, Inc. and Castle Pines Metropolitan Dist.

Petrock & Fendel, P.C., James J. Petrock, Frederick A. Fendel, III, Denver, for applicants-appellees Friedkin Companies and Friedkin Investments, Inc.

Krassa, Lindholm, Kumli & Madsen, Robert F.T. Krassa, Karl F. Kumli, III, Boulder, for opposer-appellee Parker Water and Sanitation Dist.

No appearance for applicant-appellee Castle Pines Land Co.

No appearance for opposers-appellees City of Englewood, Sanford Homes, Castleton Center Water and Sanitation Dist., Bellemah Community Development, Atchison, Topeka and Santa Fe Ry. Co., Mission Viejo Co., Highlands Ranch Development Corp., Castle Pines North Metropolitan Dist., C.P. Commercial Properties, Inc., and Centennial Water and Sanitation Dist.

Justice LOHR delivered the Opinion of the Court.

In these consolidated cases,[1] the State Engineer and the Division Engineer for Water Division No. 1 (collectively, state engineer) appeal the judgment of the District Court for Water Division No. 1 finding that post-withdrawal depletions will be noninjurious in each case and therefore approving plans for augmentation proposed by the applicants.[2] Pursuant to our order of remand in *State Engineer v. Castle Meadows, Inc.*, 856 P.2d 496 (Colo.1993) (*Castle Meadows II* ), the district court reconsidered whether the applicants' pumping of their decreed amounts of not nontributary water will cause post-withdrawal depletions to the surface stream system that will injure holders of water rights, without relying on evidence of additional water that will become available in the form of runoff as a result of increased development of the surrounding land areas in making the injury determinations. Upon remand, the parties agreed that no additional evidence

1. These cases were separately tried and decided, but were consolidated for purposes of briefing and oral argument in *State Engineer v. Castle Meadows, Inc.*, 856 P.2d 496 (Colo.1993) (*Castle Meadows II* ), and have been consolidated for those purposes again prior to the filing of the opening brief in this appeal.

2. We have jurisdiction over these cases pursuant to Colo. Const. art. VI, § 2, and § 13-4-102(1)(d), 6A C.R.S. (1987), which statutorily excludes from the court of appeals' jurisdiction appeals from final judgments of district courts in "[w]ater cases involving priorities or adjudications." *See also* C.A.R. 1(a)(2).

was necessary to resolve the injury issue, and the water judge found and concluded:[3]

[T]hat the preponderance of the evidence is that there will be no injurious depletions caused by the withdrawals in these cases, regardless of consideration of any increase in run-off from urbanization and that retained jurisdiction on the question of injury of post-pumping depletions from these not nontributary wells is not required.

Because we conclude that (1) the record supports the district court's findings that no injury will occur as a result of post-pumping depletions in these two cases, and (2) the district court did not rely on increased runoff from urbanization to reach its conclusions, we now affirm the district court's judgment approving the applicants' plans for augmentation.

## I.

Although a complete history of the facts as they were presented at each stage of these

cases appears in our prior decisions,[4] it is useful to recount the proceedings leading up to this appeal. We do so by essentially reiterating the facts as they appear in those earlier decisions.

## A.

The first case that we consider arose when Yale Investments, Inc. (Yale Investments)[5] sought water rights to Denver Basin[6] ground water to provide service to The Meadows Development, a planned community located near Castle Rock, Colorado. The specific right now at issue is based on a decree that Yale Investments obtained in April of 1987, entitling it to make annual withdrawals of 2,990 acre-feet of "not nontributary"[7] ground water through its Denver aquifer wells. Pursuant to section 37–90–137(9)(c), 15 C.R.S. (1990),[8] the decree provided that as a condition to the right to use

3. The finding and conclusion is contained in a single document setting forth the district court's findings of fact, conclusions of law, judgment and decree for both cases.

4. See *Castle Meadows II*, 856 P.2d 496; *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106 (Colo. 1990) (*Castle Meadows I*).

5. The action was instituted by Lincoln Savings and Loan Association, the predecessor in interest of Castle Meadows, Inc. By order of the water court, dated July 21, 1993, Yale Investments, Inc. was substituted for Castle Meadows, Inc. as the applicant. For simplicity, we refer to this party as Yale Investments throughout the opinion.

6. The Denver Basin is composed of four different aquifers, the Dawson, Denver, Arapahoe, and Laramie–Fox Hills. Withdrawals of ground water from these aquifers is governed by § 37–90–137, 15 C.R.S. (1990 & 1994 Supp.).

7. "Nontributary ground water" is statutorily defined as:

that ground water, located outside the boundaries of any designated ground water basins in existence on January 1, 1985, the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal.

§ 37–90–103(10.5), 15 C.R.S. (1990). Although there is no legislative definition of "not nontributary ground water," that phrase is used in § 37–90–137(9)(c), 15 C.R.S. (1990), the statutory provision that requires judicially approved plans for

augmentation to be included in decrees for withdrawing from the four Denver Basin aquifers ground water that does not meet the legislature's definition of nontributary. The statutes governing the withdrawal of ground water that is nontributary do not impose this augmentation requirement upon applicants who seek to withdraw such water. See §§ 37–90–137(1), (2), (4), (6); § 37–92–305(11), 15 C.R.S. (1990 & 1994 Supp.).

8. In pertinent part, § 37–90–137(9)(c) provides:

As to wells which will be completed in the Dawson, Denver, Arapahoe, and Laramie–Fox Hills aquifers and will withdraw ground water which is not nontributary ground water, as defined in section 37–90–103(10.5), judicial approval of plans for augmentation shall be required prior to the use of such ground water.... As to such wells completed in the Denver, Arapahoe, or Laramie–Fox Hills aquifers more than one mile from any point of contact between any natural stream including its alluvium on which water rights would be injuriously affected by any stream depletion, and any such aquifer, such decrees shall provide for the replacement to the affected stream system or systems of a total amount of water *equal to four percent of the amount of water* withdrawn on an annual basis.... Such decrees may also require the continuation of replacement after withdrawal ceases if necessary to compensate for injurious stream depletions caused by prior withdrawals from such wells and shall meet all other statutory criteria for such plans.

this ground water, Yale Investments was required to obtain judicial approval of a plan for augmentation ensuring the replacement of four percent of the amounts withdrawn annually.

Consequently, in October of 1986, Yale Investments filed an application in the district court seeking approval of a plan for augmentation satisfying the four percent replacement obligation. This plan included using direct discharges from the development's wastewater treatment plant, taking credit for return flows that result from irrigation of the overlying property, and using direct discharges of nontributary and not nontributary ground water from various wells. The district court determined that Yale Investments' plan was sufficient to meet its obligation under section 37–90–137(9)(c) to return to the natural stream system four percent of the amounts that are withdrawn annually. This plan for augmentation, however, extended only to those years in which water is actually pumped from the wells. Although the court found that Yale Investments' withdrawals will have "some continuing depletive effect on the tributary stream system after 100 years,"[9] it did not require that water be replaced after cessation of withdrawals from the wells—the post-withdrawal period. The court therefore approved Yale Investments' plan for augmentation, and because such judicial approval satisfied the condition in the April 1987 decree, on December 29, 1988, entered a final judgment and decree entitling Yale Investments to withdraw 2,990 acre-feet of Denver aquifer ground water annually.

The state engineer appealed, contending that Yale Investments' plan for augmentation did not satisfy section 37–90–137(9)(c). We agreed with the state engineer's argument that the plan for augmentation mandated under section 37–90–137(9)(c) requires the compensation of depletions to a stream after ground water withdrawals cease. *Castle Meadows I*, 791 P.2d at 1113–14. Because the district court had found that post-withdrawal depletions would accrue to the stream but "did not find such depletions to be injuri-

ous" to other water rights, we remanded the case for the court to consider whether Yale Investments' pumping will cause such injury and, if so, to impose terms and conditions on its plan for augmentation to alleviate that injury. *Id.* at 1114.

On remand, the district court held an evidentiary hearing at which several experts testified as to the projected post-withdrawal stream depletions. Yale Investments' expert, Robert E. Brogden, predicted that after the end of 100 years of continuous pumping there will be a reduction of 27.2 acre-feet of water per year in the South Platte stream system. In contrast, the state engineer's expert testified that Yale Investments' withdrawals will result in post-withdrawal stream depletions of approximately 8 acre-feet of water per year. Brogden concluded that the amount of post-withdrawal depletions would be insignificant and noninjurious.[10]

Based on the evidence presented at the hearing, the court again concluded that depletions will accrue to the stream after Yale Investments ceases its withdrawals. In its February 27, 1992, Supplemental Findings of Fact, Conclusions of Law, Judgment and Decree, the district court found that the preponderance of the evidence establishes that the total depletions "will not be less than 8.7 acre-feet [per year] nor more than 27.2 acre-feet [per year]." It determined, however, that the depletions will not be injurious. In reaching this conclusion, the district court considered the impact that increased development and urbanization of the surrounding land areas will have on the amounts of water available to the stream in the form of runoff, stating:

> The pumping involved here is in connection with municipal-type development in the Castle Rock area. There will be additional impermeable pavement and roof area, different types of vegetation present, and other changes which will increase the returns to the surface stream. The preponderance of the evidence is that the

---

9. An aquifer life of 100 years is assumed in determining the amount of water that may be decreed for annual withdrawal under § 37–90–137(4)(b)(I), (6), 15 C.R.S. (1990 & 1994 Supp.).

10. See Part II.B., *infra*, for a more detailed discussion of Brogden's testimony.

additional returns to the stream caused by urbanization will be greater than the depletions due to pumping after 100 years.[11] After offsetting the increased runoff that is to result from the area's development against the amounts of post-withdrawal stream depletions expected to accrue to the stream by virtue of Yale Investments' pumping, the court concluded that the projected depletions will not be injurious and that Yale Investments' plan for augmentation satisfied section 37–90–137(9)(c). The court therefore reconfirmed its December 29, 1988, judgment as so supplemented.

## B.

In the second of these consolidated cases, Castle Pines Metropolitan District and Castle Pines Land Company (collectively, Castle Pines)[12] filed an application in December of 1985 for change of certain water rights that it held under existing decrees and for a decree adjudicating its right to withdraw all previously undecreed ground water from the Denver aquifer underlying 2,508 acres of land in the Castle Rock area. It sought use of this water for the primary purpose of meeting the needs of a proposed planned community development on the property. Although Castle Pines requested a determination that the water it wished to withdraw was nontributary ground water as defined in section 37–90–103(10.5), it proposed and sought approval of a plan for augmentation that provided for replacements to the stream system of four percent of its annual withdrawals in the event the court should determine the water to be not nontributary. Castle Pines proposed to satisfy its four percent replacement obligation with seepage waters produced from reservoirs and ponds located on or near the overlying property, direct discharges from a wastewater treatment plant and from wells producing ground water, and return flows from irrigation on or near the land.

After reviewing Castle Pines' application, the state engineer[13] found that the ground water was not nontributary and that judicial approval of a plan for augmentation would be required before the water could be used. In the state engineer's view, in order to satisfy the requirements of section 37–90–137(9)(c), Castle Pines needed to ensure the replacement not only of four percent of the amounts to be withdrawn during those years it actually pumped ground water but also of the amounts by which the stream will be depleted after cessation of its withdrawals. As to this latter requirement, the state engineer sought a "dedication of a quantity of water from an identified renewable water supply source sufficient to replace the maximum annual post-pumping depletive effect" caused by Castle Pines' withdrawals.

On July 10, 1991, the parties went to trial to resolve two issues: (1) whether the subject ground water was nontributary or not nontributary; and (2) whether Castle Pines' withdrawals would result in injurious post-withdrawal stream depletions, and if so, what type of water rights Castle Pines could use to satisfy the augmentation requirements contained in section 37–90–137(9)(c). Castle Pines' expert, James Jehn, testified that the connection between the aquifer and the surface stream was broken in several locations, and that further disconnections would occur over time. For this and other reasons, Jehn concluded that the post-withdrawal depletions would be noninjurious.[14]

11. The "returns to the surface stream" represent water from sources other than the Denver aquifer wells at issue here because the period of time under consideration is that following cessation of pumping from those wells.

12. On May 9, 1991, the Resolution Trust Corporation (RTC) filed a motion to intervene in the proceedings as a co-applicant based on its assertion that it had an interest in the water rights pursuant to the terms of a deed of trust that was then in the process of foreclosure. The Friedkin Companies and Friedkin Investments, Inc. (collectively, Friedkin) later succeeded to RTC's interest and also acquired an additional interest from Castle Pines Land Company. In an order dated July 3, 1991, the district court allowed Friedkin to intervene in the action as a co-applicant. For convenience, we refer to the applicants in this case collectively as Castle Pines.

13. The term "state engineer" as used in this paragraph does not include the Division Engineer for Water Division No. 1.

14. See Part II.B., infra, for a more detailed discussion of Jehn's testimony.

In the single Memorandum of Decision and Order issued for both the Yale Investments and the Castle Pines cases dated September 17, 1991, the district court found that the water Castle Pines sought a right to withdraw was not nontributary ground water. It therefore held that section 37–90–137(9)(c) required a plan for augmentation providing for stream replacements in the amount of four percent of its annual withdrawals. The court also found that Castle Pines' pumping would result in maximum post-withdrawal stream depletions of 15.9 acre-feet per year "up to and after 400 years." The district court, however, concluded that these depletions would not be injurious, stating:

> [T]he pumping involved in this case is in connection with the urbanization of certain lands in the Castle Rock area. The preponderance of the evidence is, and the court finds, that the increase in returns to the surface stream caused by such urbanization will substantially exceed the depletions in the post-pumping period.

As in the Yale Investments case, the court's finding of noninjury was based on its offset of the amounts of increased runoff attributable to projected development of the area against the projected post-withdrawal stream depletions. Thereafter, on February 27, 1992, the court issued its Findings of Fact, Conclusions of Law, Judgment and Decree, which included a holding that Castle Pines was not required to augment the stream system after withdrawals cease and that it would satisfy its statutory obligation by replacing four percent of its annual withdrawals during the years in which water is withdrawn through the wells. Finding Castle Pines' proposed plan for augmentation sufficient to meet this requirement, the court confirmed Castle Pines' right to withdraw 753.7 acre-feet of ground water per year from the Denver aquifer underlying its property.

### C.

In *Castle Meadows II*, these two cases were consolidated for the purpose of issuing a single opinion, and we considered whether the district court erred in taking into account additional water that will become available as runoff due to urbanization as a factor in its determinations that the post-withdrawal depletions will be noninjurious. We concluded "that the district court erred in considering urban runoff expected to accrue to the stream system as a result of development of overlying land areas as a basis for finding that the applicants' pumping of their decreed amounts of groundwater from the Denver aquifer will not result in injurious post-withdrawal stream depletions." *Castle Meadows II*, 856 P.2d at 510. We thus reversed the district court and remanded the cases with directions that the court determine whether injury will result to other water rights from post-withdrawal depletions if runoff from urbanization is not considered as part of the compensation for such depletions.

In a "decree conference," the parties agreed that no further evidence was necessary to resolve the cases.[15] The district court subsequently concluded that no injury would occur as a result of post-withdrawal depletions regardless of whether increased runoff from urbanization is considered. Specifically, the district court held:

> [T]hat the preponderance of the evidence is that there will be no injurious depletions caused by the withdrawals in these cases, regardless of consideration of any increase in run-off from urbanization and that retained jurisdiction on the question of injury of post-pumping depletions from these not nontributary wells is not required.

The district court therefore issued its Supplemental Findings of Fact, Conclusions of Law, Judgment and Decree on October 4, 1993, reconfirming its approval of the two plans for augmentation at issue in these consolidated cases.

The state engineer appeals, arguing that the district court erred for three reasons. First, the state engineer contends that the court's noninjury determination was not based on any credible evidence because the applicants' calculation methodology was incapable of producing accurate results. Second, the state engineer argues that the court

---

15. The evidence on which the district court based its determination, therefore, consists of the same expert testimony presented to the district court prior to the appeals in *Castle Meadows II*.

erred in considering the "temporal remoteness" of the post-withdrawal stream depletions as a mitigating factor. Third, the state engineer contends that the court erred in considering the difficulty of measuring the relatively small volumes of post-withdrawal depletions as a factor in determining the adequacy of the plans for augmentation. We reject the state engineer's contentions and hold that the district court's determinations that post-withdrawal depletions will be noninjurious in each case are supported by the record and that the court made these determinations without relying on increased runoff as a result of urbanization as a necessary factor to reach this result, as required by our remand order in *Castle Meadows II*.

## II.

In *Castle Meadows II*, we held that "when the district court considered whether injury will occur, it improperly offset the projected stream depletions by the amounts of water that will become available as the overlying lands are developed and increased surface areas are made impermeable." *Castle Meadows II*, 856 P.2d at 502. The narrow issue on remand to the district court, therefore, was whether increased runoff resulting from urbanization was a necessary factor in the district court's determination that no injury will occur from post-withdrawal depletions. We stated:

> Because this is a question involving facts that must be determined by the district court, we remand these cases for that court to consider whether the evidence, exclusive of the amounts of urban runoff projected to result from the area's development, shows that the applicants' use of their decreed amounts of water will result in injury after their withdrawals cease.

*Id.* at 510. The district court acknowledged the narrow scope of the issue presented to it on remand when it stated: "As mandated by the Supreme Court, the Court now proceeds to consider the evidence without considering the effects of increased runoff."

## A.

Under plans for augmentation proposed pursuant to section 37–90–137(9)(c), 15 C.R.S. (1990 & 1994 Supp.), post withdrawal depletions must be replaced if they are injurious to vested water rights. *Castle Meadows II*, 856 P.2d at 500; *Castle Meadows I*, 791 P.2d at 1115. "The issue of injurious effect is inherently fact specific and one for which we have always required factual findings." *Castle Meadows II*, 856 P.2d at 508 (citing *In re Application for Water Rights*, 799 P.2d 33, 37–38 (Colo.1990); *Weibert v. Rothe Bros. Inc.*, 200 Colo. 310, 318–19, 618 P.2d 1367, 1373 (1980); *Hallenbeck v. Granby Ditch and Reservoir Co.*, 160 Colo. 555, 572–74, 420 P.2d 419, 427 (1966)). A plan for augmentation is evaluated by the water judge based on the same "absence of injurious effect" criterion involved in evaluating an application for a change of water right. § 37–92–305(3), 15 C.R.S. (1990); *Weibert*, 200 Colo. at 318–19, 618 P.2d at 1373. Moreover, "[i]njury 'must be demonstrated by evidential facts and not by potentialities.'" *Brighton Ditch Co. v. City of Englewood*, 124 Colo. 366, 371, 237 P.2d 116, 119–20 (1951) (quoting *Del Norte Irr. Dist. v. Santa Maria Reservoir Co.*, 108 Colo. 1, 113 P.2d 676 (1941)). Where senior users cannot show that their water rights will be injured as a result of the diversion, they cannot preclude the beneficial use of water by the applicant. *Cache La Poudre Water Users Ass'n v. Glacier View Meadows*, 191 Colo. 53, 61, 550 P.2d 288, 293–94 (1976); *see also Fellhauer v. People*, 167 Colo. 320, 336, 447 P.2d 986, 994 (1968) (noting that it is implicit in the Colorado Constitution that "there shall be *maximum utilization* of the water of this state") (emphasis in original).

In *Castle Meadows II* we expressly rejected the state engineer's contention that as a matter of law post-withdrawal depletions will be injurious. *Castle Meadows II*, 856 P.2d at 508 (noting that we implicitly rejected this argument in *Castle Meadows I*). The applicants bear the initial burden of producing evidence sufficient to establish a prima facie case that the proposed depletion will be noninjurious. *See* § 37–92–304(3), 15

C.R.S. (1990).[16] Once the applicants have met that burden, the objectors bear the burden of going forward with evidence of injury to existing water rights. *See, e.g., Castle Meadows II,* 856 P.2d at 509. The ultimate burden of showing absence of injurious effect by a preponderance of the evidence where contrary evidence of injury has been presented continues to rest on the applicant. *See* § 37–90–304(3); *Castle Meadows I,* 791 P.2d at 1115.

## B.

■ Yale Investments and Castle Pines both provided expert testimony, upon which the district court relied, that post-withdrawal depletions will be noninjurious. The record, therefore, supports the district court's factual determinations that post-withdrawal depletions in these cases will be noninjurious, and those findings will not be disturbed on appeal.

In the Yale Investments case, the applicant's expert witness, Robert E. Brogden, testified that "at the end of 100 years, there will be 27.2 acre-feet of water per year less in the South Platte River system as a result of pumping these wells." [17] Brogden, however, testified that in his expert opinion such post-withdrawal depletions will be noninjurious.[18] He based his conclusion that the post-withdrawal depletions will be noninjurious on several considerations.[19] Brogden testified:

First, there was a general over-replacement of depletion to the river system by [Yale Investments] during that first 100

year treaty. Second, there will be some other Senate Bill 5 [augmentation] plans that come on line after [Yale Investments' augmentation plan] . . . that are over-replacing, replacing depletions at that point.

Third, given the substantial amount of water in the South Platte River system, with an average discharge of 294,100 acre-feet of water per year at the United States Geological Survey's Englewood, Colorado, gauge, a loss of 27.2 acre-feet of water per year would be "*de minimus* and not significant." [20] Fourth, Brogden testified that the South Platte River system is not 100% over-appropriated and that a 1991 water right [such as Yale Investments'] would be in priority for many days during the year. Fifth, Brogden testified that 27.2 acre-feet depletion is an annualized depletion and would therefore occur uniformly throughout the year so that part of the depletion will not affect the availability of water for irrigation during the growing season. Therefore, it was Brogden's expert opinion that post-withdrawal depletions by Yale Investments will be noninjurious.[21]

Castle Pines' expert, James Jehn, testified in the Castle Pines case that the plan for augmentation as written would not cause material injury to water rights in Colorado. Specifically, Jehn based his opinion on the following:

[E]ven with the State assumptions and assuming 5½ acre-feet per year as the depletions at 100 years, that amount is not felt downstream. It can't be measured

16. In pertinent part, § 37–92–304(3) states:
The applicant shall appear either in person or by counsel and shall have the burden of sustaining the application . . . and in the case of a change of water right or a plan for augmentation the burden of showing absence of any injurious effect.

17. Brogden's calculations were based on a computer model that he built of the Denver aquifer. The state engineer's computer model predicted stream depletions at a lower rate of approximately 8.7 acre-feet year.

18. Additionally, Brogden testified that his noninjury conclusion would be the same even if it were based on depletions of 75 acre-feet per year, which is the maximum post-withdrawal depletion projected under his model that would occur in about year 395.

19. Except as specifically referred to in this opinion, the state engineer has not challenged the appropriateness of specific considerations relied upon by the expert witnesses, and we express no opinion on the unchallenged considerations.

20. Brogden testified that given the five to ten percent margin of error in stream gauging, a loss of 27.2 acre-feet of water per year would be insignificant, even compared to the amount of water not accounted for due to the margin of error.

21. Brogden referred to increased runoff resulting from urbanization as one of several reasons why the base flow of the river system is greater now than it was during particularly dry years in the 1950s.

downstream. No senior water right would be injured even by that amount of calculated depletions. Actual depletions and replacement obligations would be less than that, even assuming those same assumptions are used, because the water right would be in priority an average of 40 percent of the time. Finally, I don't believe existing conditions warrant the use of the same stream node contact areas in the State's model. In fact, at least three of those nodes—four of those nodes, excuse me, the contact area is broken below that; and, as modeled, show that the pumping of Denver water from Castle Pines at all the sites is nontributary.

Jehn testified that the connection between the stream and the aquifer was broken in several locations and that further areas of disconnection would develop over time. He further stated that the water in the aquifer in the four sections that are disconnected would be nontributary after 100 years of depletion. Thus, removing those sections from the model, "the rate of depletion is less than $\frac{1}{10}$ of 1 percent." Once the break occurs, the depletive effect does not increase over time. Jehn concluded: "My opinion is the pumping of the Denver wells at Castle Pines would have no injury to any water rights downstream of Castle Pines."

Each applicant, therefore, presented evidence sufficient to permit the district court to find that the applicant's post-withdrawal depletions would be noninjurious. The state engineer's witnesses testified only that the water system as a whole would suffer injury due to a reduction resulting from post-withdrawal depletions regardless of the amounts of these depletions.

■ The issue of injurious effect is fact specific. See, e.g., Castle Meadows II, 856 P.2d at 508. Therefore, the district court's factual determinations and conclusions based thereon cannot be disturbed on appeal if they are supported by the record. E.g., Public Service Co. v. Willows Water Dist., 856 P.2d 829, 835–36 (Colo.1993) (holding that the wa-

ter court's findings were supported by the record and in turn supported the conclusion that a plan for augmentation was adequate, though not free from uncertainties, and therefore must be affirmed on appeal); Peterson v. Ground Water Comm'n, 195 Colo. 508, 516, 579 P.2d 629, 635 (1978). "'We have repeatedly held that in such circumstances the finding of the trial court, if supported by the evidence, will not be disturbed by this Court.... Moreover, it is also our duty in such cases to search the record for evidence most favorable to the judgment of the trial court.'" Peterson, 195 Colo at 516, 579 P.2d at 634 (quoting Adler v. Adler, 167 Colo. 145, 445 P.2d 906 (1968)). As noted previously, the record supports the trial court's conclusions that the post-withdrawal depletions will be noninjurious in each case. Specifically, the record contains expert testimony that the post-withdrawal depletions will not result in injury. Furthermore, the record contains testimony as to the reasons for the experts' conclusions that the post-withdrawal depletions will be noninjurious, which demonstrates that these opinions were not based on increased runoff due to urbanization as a necessary factor in arriving at those conclusions. The district court expressly relied on the expert testimony in making its ruling: "Mr. Brogden gave an expert opinion that no injury would occur. His opinion was *not* based at all on increased runoff from impervious surfaces due to development within the Meadows area." The district court also expressly relied on Jehn's testimony that "the connection between the aquifer and the stream was broken in many sections, negating any possible injury." Although the record contained a limited amount of testimony on increased runoff, the court noted that "it was not a basis of Mr. Jehn's expert opinion of noninjury." Because the record supports the district court's determinations that the post-withdrawal depletions will be noninjurious, we will not disturb the district court's findings of fact on appeal.[22]

---

**22.** The question of whether the district court should retain jurisdiction to modify the plans for augmentation is moot for the independently sufficient reasons that we affirm the district court's determination that the post-withdrawal depletions will be noninjurious, and the parties no longer argue that the district court should retain jurisdiction.

## C.

■ The state engineer's argument that no credible evidence supports the trial court's decision fails because it would have us independently evaluate the credibility of the experts who testified. *See, e.g., American Water Development, Inc. v. Alamosa,* 874 P.2d 352, 367–68 (Colo.1994) (*AWDI*) (the trial court's factual determinations were based on expert testimony in the record and therefore would not be overturned on appeal), *cert. denied,* —— U.S. ——, 115 S.Ct. 575, —— L.Ed.2d —— (1994); *Board of County Comm'rs v. Upper Gunnison River Water. Cons. Dist.,* 838 P.2d 840, 847 (Colo. 1992) ("A water court's predicate factual determinations will not be disturbed on appeal unless the evidence is wholly insufficient to support those determinations.") The mere fact that the trial court acknowledged that it may be impossible to make an accurate determination of injury does not save the state engineer's argument. In an analogous context, we have repeatedly held that uncertainties are not fatal to a plan for augmentation. *Willows Water Dist.,* 856 P.2d at 835–36 (citing *Cache La Poudre,* 191 Colo. at 63, 550 P.2d at 295–96; *Kelly Ranch v. Southeastern Colorado Water Cons. Dist.,* 191 Colo. 65, 79, 550 P.2d 297, 308 (1976)).

■ We also reject the state engineer's contention that the trial court erred in considering the "temporal remoteness" of post-withdrawal depletions and the "inability to measure" those depletions as factors in concluding that the post-withdrawal depletions will be noninjurious. We are not persuaded by these arguments because the narrow issue on remand to the district court was whether increased runoff due to urbanization was a necessary factor in concluding that the post-withdrawal depletions will be noninjurious. When a case is remanded to the trial court and subsequently appealed, the reviewing court will consider only those issues arising after the remand and whether the trial court complied with the order of remand. *See National Bank of Denver v. Bartges,* 122 Colo. 546, 548–49, 224 P.2d 658, 660–61 (1950), *cert. dismissed,* 340 U.S. 957, 71 S.Ct. 575, 95 L.Ed. 689 (1951); 5 C.J.S. *Appeal and Error* § 850 (1993). Moreover, the state

engineer already had an opportunity to appeal these issues because the record on which the district court based its ruling in the present appeal is identical to the record that was before us in *Castle Meadows II. See Trinchera Ranch Co. v. Trinchera Irrigation Dist.,* 89 Colo. 170, 173–74, 300 P. 614, 615 (1931); 5 C.J.S. *Appeal and Error* § 849 (1993) (stating that issues adjudicated in a prior proceeding are the law of the case in a subsequent appeal based on the same or substantially similar evidence).

■ Although the state engineer contends that the temporal remoteness issue was not the basis of the water court's prior decisions, the record supports our conclusion that the water court considered this issue in reaching those decisions. Specifically, the district court's September 17, 1991, order stated:

> It is, of course, impossible to predict the exact nature of effects which will occur in a century or two, especially when those effects are small. Even more difficult would be the effort to carry those effects out to infinity, as [an expert witness] indicated in his testimony might be the present focus of the research in the office of the state engineer.

> .    .    .    .    .

> With these considerations in mind and based on the evidence received in the various hearings held herein, the court finds that the preponderance of the evidence is that there will be no injurious depletions caused by the withdrawals in this case.

The state engineer's contention that the district court improperly considered the "inability to measure" the post-withdrawal depletions as a factor in holding that those depletions will be noninjurious also fails. One expert witness, who testified prior to the state engineer's previous appeal, stated that the estimated depletions would be so small that they could not be measured downstream. Moreover, the trial judge necessarily considered the accuracy of the measuring methodologies and predictions in weighing the evidence presented. The district court's prior decision that the state engineer appealed in *Castle Meadows II,* therefore, was based on the identical evidence as that pre-

**700**

sented in this appeal and considered the same issues now appealed by the state engineer.

## III.

The applicants argue that this appeal by the state engineer is frivolous and thus the applicants request attorney fees. In *Southeastern Colorado Water Cons. Dist. v. Cache Creek Mining Trust,* 854 P.2d 167, 177 (Colo.1993), we recently restated the standard for determining whether an appeal is frivolous. An appeal is " 'frivolous if the proponent can present no rational argument based on the evidence or the law in support of proponent's claim or defense, or the appeal is prosecuted for the sole purpose of harassment or delay.' " *Id.* (quoting *Mission Denver Co. v. Pierson,* 674 P.2d 363, 366 (Colo. 1984)). The record in the present case does not support a finding that the state engineer appealed the district court's decision solely for the purpose of harassment or delay. The state engineer essentially contends that the district court erred because its noninjury determination was not based on any credible evidence and because it considered temporal remoteness and the inability of accurately measuring the post-withdrawal depletions as factors in ruling that the post-withdrawal depletions will be noninjurious. Although we reject the state engineer's contentions, they have some rational basis in the evidence and law and therefore are not frivolous. The applicants have failed to prove that the state engineer's appeal was frivolous and thus we do not award the applicants attorney fees. *See AWDI,* 874 P.2d at 383 (stating that the party seeking fees bears the burden of proving by a preponderance of the evidence that it is entitled to such an award).

## IV.

Based on the foregoing analysis, we hold that the district court did not err in finding that post-withdrawal depletions will be noninjurious because (1) expert testimony in the record supports the district court's factual findings and (2) the district court complied with our remand order in *Castle Meadows II* by making its injury determination without considering increased runoff from urbaniza-

tion as a mitigating factor. We therefore affirm the district court's judgment reaffirming its approvals of the applicants' plans for augmentation.