**UPPER EAGLE REGIONAL WATER AUTHORITY, Applicant–Appellee**

v.

**Harold ("Hal") D. SIMPSON, State Engineer; Alan C. Martellaro, Division Engineer for Water Division 5; Colorado Water Conservation Board, Opposers–Appellants.**

**and**

**City of Aurora, through the Homestake Project; City of Colorado Springs, through the Homestake Project; and Colorado River Water Conservation District, Opposers–Appellees.**

**No. 06SA303.**

Supreme Court of Colorado,
En Banc.

Sept. 10, 2007.

As Modified on Denial of Rehearing
Oct. 1, 2007.

Porzak Browning & Bushong LLP, Glenn E. Porzak, P. Fritz Holleman, Kevin J. Kinnear, Eli A. Feldman, Boulder, Colorado, Attorneys for Upper Eagle Regional Water Authority.

John W. Suthers, Attorney General, Paul L. Benington, Assistant Attorney General, Alexandra L. Davis, Assistant Attorney General, Denver, Colorado, Attorneys for State and Division Engineer and Colorado Water Conservation Board.

No appearance by or on behalf of City of Aurora, through the Homestake Project; City of Colorado Springs, through the Homestake Project; and Colorado River Water Conservation District.

Chief Justice MULLARKEY delivered the opinion of the Court.

This case involves an application for augmentation and exchange filed by the Upper Eagle Regional Water Authority ("the Authority"). The proposed plan allows the Authority 10.8 acre-feet of out-of-priority deple-

tions from its three main diversion points on the Eagle River, and in exchange, the Authority is responsible for releasing augmentation water from Wolford and/or Ruedi Reservoirs. Relying on a table of estimated depletion rates based on a projected mix of uses in the Authority's service area, the Authority calculated its replacement obligations and argued that no injury would inhere to vested water rights by operation of its proposed plan. The Colorado Water Conservation Board ("CWCB") objected, arguing that the Authority was required to show the actual mix of uses and the actual rates of depletion for irrigation and in-house use before its plan could be approved. The water court ruled that the Authority had met its burden of showing an absence of injurious effect should the plan be enacted, and as a corollary, that the CWCB had failed to come forward with evidence calling such a determination into question. We affirm, reasoning that the water court properly concluded that the Authority demonstrated the plan would cause no injury, but we rule that claim preclusion would not have barred reconsideration of the depletion table had the question of injury been resolved differently.

## I. Facts and Procedural History

The Upper Eagle Regional Water Authority encompasses six member entities, including the Town of Avon, and the Metropolitan Districts of Eagle–Vail, Edwards, Arrowhead, Berry Creek and Beaver Creek. The Authority diverts over 5,000 acre-feet of water per year to service roughly 25,000 customers in the second largest water system on Colorado's western slope. Taken as a whole, the existing level of development within the Authority's service area is in excess of 70% of total projected build-out, while some of the

individual service areas are at or near 100% build-out.

Prior to the Authority's formation in 1984, all the Authority's member entities, save for Beaver Creek, had adjudicated augmentation plans [1] (collectively the "Original Decrees"), and Beaver Creek had adjudicated a change of water right.[2] The Original Decrees projected future development, water demands and water consumption—including the mix of uses between in-house use and outdoor irrigation—for five of the respective member entities, although Beaver Creek's change of water right decree contained no such projections. The Original Decrees were based on projected irrigation depletion rates varying from 50–75% and in-building depletion rates of 5–9%, assuming 100% build-out.

Based on the depletion projections in the Original Decrees and related engineering reports, the Authority's engineer, Thomas Williamsen, developed in 1992–93 a table of monthly depletion rates with a column for each member entity. Williamsen originally developed the table in consultation with Orlyn Bell, who was then the Division Engineer for Water Division No. 5. The table is used to calculate the projected depletion from out-of-priority diversions within each of the Authority's service areas in any given month. For the winter months (November through April), each entry reflects depletion from in-house use only—figures that are generally agreed upon by both parties. For the irrigation season (May through October), however, each entry incorporates the in-house depletion calculation for the specific entity, combined with the decreed projected depletions for outdoor irrigation use.[3] The table reflects the predicted mix, upon reaching full build-out, between in-house use and outdoor irrigation as projected more than twenty years ago in the Original Decrees.[4]

1. The augmentation plans were established in: Case Nos. 80CW397 (Arrowhead Metropolitan District); W–3664 and 84CW225 (Town of Avon); W–3999 (Berry Creek Metropolitan District); W–3289 (Eagle–Vail Metropolitan District); and Consolidated Case Nos. 81CW161 and 81CW195 (Edwards Metropolitan District).

2. Beaver Creek adjudicated a change of water right in Case No. W–2746.

3. The table does not separately break out rates of depletion for in-house use from rates of depletion for irrigation. Rather, the table combines both figures for each entity to arrive at one calculation, which represents the ratio of depletions compared to diversions for each entity for each month.

4. This holds true for all calculations except those related to Beaver Creek; the table assumes a 5% in-house depletion rate for November through April, and an average of the other entities' pro-

The Authority previously relied on the depletion table in Case Nos. 98CW205 and 98CW270—both applications for plans for augmentation in which the CWCB was a party. In Case No. 98CW205, the Authority circulated an April 1999 engineering report indicating the Authority intended to calculate its augmentation obligation according to the depletion table. The CWCB did not question or challenge the accuracy of the depletion table. Six months later, the CWCB stipulated out of the case but remained a party and continued to receive all pleadings. The Authority subsequently entered into a stipulation with the remaining objector, the Public Service Company of Colorado ("PSCo"), which holds the senior, dominant calling right in the Upper Colorado River Basin. After review of the Original Decrees and their underlying engineering reports, PSCo's water resource engineer, Gary Thompson, determined that the depletion table accurately summarized the Original Decrees and therefore represented a reasonable basis to calculate the Authority's out-of-priority diversions. Accordingly, PSCo insisted on incorporation of the table into the final decree in that case in order to protect its water rights. The CWCB did not protest the decree or appeal its entry.

Later, in Case No. 98CW270, the Authority, among others, adjudicated a plan for augmentation involving 500 acre-feet of replacement water from Homestake Reservoir. The August 1999 engineering report presented to the CWCB in support of the application explained that the Authority intended to account for its augmentation obligations by using the depletion table. Nevertheless, the CWCB did not challenge the Authority's use of the table, protest the referee's ruling, or appeal entry of the decree in that case.

The case at bar arose several years ago when the Village at Avon was annexed into the Town of Avon, which brought the Village at Avon into the Authority's service area. Prior to annexation, the Village at Avon was serviced by the Traer Creek Metropolitan District. Upon annexation, per the Authority's policy, the Traer Creek Metropolitan District dedicated to the Authority water rights sufficient to meet the development's estimated annual potable water demands, along with an additional 20%; it is this conveyance from Traer Creek Metropolitan District to the Authority, which totals about 10.8 acre-feet, that is at issue before us.

Seeking to incorporate this dedication into a general plan for augmentation so that the water might be used throughout its entire service area, the Authority filed an application for augmentation and exchange. The proposed plan would allow the Authority 10.8 acre-feet of out-of-priority depletions from the Eagle River [5] if augmented by replacement water released from Wolford and/or Ruedi Reservoirs. The Authority proposed to calculate its replacement obligations based on the table.

Statements of opposition were timely filed by the CWCB, the cities of Aurora and Colorado Springs through the Homestake Project, and the Colorado River Water Conservation District, but the River District and the Homestake Project later stipulated to a proposed decree. State and Division Engineers also moved to intervene, but their intervention was denied as untimely. The CWCB, however, continued to oppose the Authority's application in order to protect instream flow rights on the Eagle River, submitting a series of expert witness reports that identified various issues in the proposed decree, which was, in turn, revised twice in order to address the CWCB's concerns. Chief among

jected depletion rates for May through October, which the Authority's engineer had arrived at by "[going] up there in the district and look[ing] around." Moreover, this average was achieved using the monthly irrigation season values for the Edwards District, which are fixed at 26.2% for each month between May and October. Williamsen standardized the Edwards District's rate for each month, as opposed to using individual monthly projections, because the original Edwards decree only provided winter and irrigation season totals of expected demands and expected depletions.

5. The augmentation and exchange plan calls for out-of-priority diversions at the Authority's three main diversion points on the Eagle River—the Metcalf Headgate and Raw Water Booster Pump in Avon, and the Edwards Drinking Water Facility.

these revisions was the addition of paragraph 7(B) to the proposed decree, which prevents the operation of the requested exchange when the CWCB's instream flow rights are not met.

Just six weeks before trial and on the last day of an already extended discovery deadline, the CWCB objected to the Authority's use of the table to calculate its replacement obligations. The CWCB argued that rather than use outdated projections of depletion rates and mix of uses to calculate replacement obligations, the Authority must account for its actual irrigation and actual in-building uses to ascertain its total current depletions, which could be used going forward to project future depletions. In support, the CWCB pointed to § 37–92–305(8), C.R.S. (2006), which mandates that the water court "consider the depletions from an applicant's use or proposed use of water, in quantity and in time."

After a two day trial, which revolved primarily around the issue of whether the Authority could properly rely on its table of monthly depletion rates to account for its future out-of-priority depletions, the water court handed down an order approving the table's use for this augmentation plan and entered a final decree incorporating the table. Central to the water court's ruling was its determination that trial evidence revealed no injury would befall the CWCB or other vested water rights by operation of the plan and that the CWCB put forth no credible, competing evidence to contradict such a finding.

The CWCB filed a motion for a new trial, alleging it possessed new data demonstrating that use of the table would cause injury. However, due to the sudden and unexpected death of the water judge, the Honorable T. Peter Craven, the CWCB's motion for a new trial was not decided within sixty days and was therefore deemed denied by operation of

law pursuant to C.R.C.P. 59(j). This appeal by the CWCB followed.[6]

## II. Review of Augmentation Plan for Injurious Effects

We are guided in our resolution of this question by the Water Right Determination and Administration Act of 1969, which governs our standard of review for water augmentation plans. The Act requires that a "plan for augmentation, including [a] water exchange project, shall be approved if such change, contract, or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." § 37–92–305(3), C.R.S. (2006). The standard of no injury is one this court has long used as the touchstone in assessing the soundness of augmentation applications. *See, e.g., Concerning Application for Plan for Augmentation of City & County of Denver ex rel. Bd. of Water Comm'rs*, 44 P.3d 1019, 1025 (Colo. 2002); *Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 810–11 (Colo.2001); *Simpson v. Yale Invs., Inc.*, 886 P.2d 689, 696–97 (Colo.1994); *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1112 (Colo.1990); *Matter of May*, 756 P.2d 362, 372 (Colo.1988).

▬ The proponent of an augmentation plan has the burden of establishing the absence of injury resulting from the out-of-priority diversion of water. § 37–92–304(3) (placing the burden on the applicant of the augmentation request to prove the absence of injurious effect). If the applicant establishes an absence of injury, however, the burden of going forward shifts to the objectors, who must show evidence of injury to existing water rights. *Farmers Reservoir & Irrigation Co.*, 33 P.3d at 811. Objectors to augmentation plans need not show an injury to a specific water right; injury to senior appropriators in general is sufficient. *Concerning Application for Plan for Augmenta-*

---

6. Two issues have been presented for our review on appeal:
  1. Whether there is evidence in the record to support the Water Court's factual conclusion that use of the depletion table factors to calculate the Authority's out-of-priority depletions will prevent injury.

2. Whether incorporation of the depletion table factors in the final decree in Case No. 98CW205 operates as a matter of claim preclusion on the same issue in this proceeding.

*tion of City & County of Denver,* 44 P.3d at 1025. However, injury must be demonstrated by evidential facts and not by mere potentialities. *Yale Invs., Inc.,* 886 P.2d at 696. Only if contrary evidence of injury has been presented does the ultimate burden of showing absence of injurious effect shift back to the proponent of the plan. *Id.* at 697.

■ After reviewing the entirety of the record in this case, we conclude there is ample evidence to support the water court's finding of no injury, and we refuse to disturb that finding in this appeal. *Id.* at 698 (describing reviewing court's duty to search the record for evidence most favorable to the judgment of the trial court); *see also Pub. Serv. Co. v. Willows Water Dist.,* 856 P.2d 829, 836 (Colo.1993). As an initial matter, we are convinced that paragraph 7(B) of the proposed decree fully protects the CWCB from injury by out-of-priority diversions under this augmentation plan. The paragraph states, in part, "[u]pon any call by the CWCB for enforcement of its decrees instream flow rights in Case Nos. 80CW124, 80CW126, and 80CW134 that is recognized and administered by the State or Division Engineers, the Authority agrees that it will not operate the plan for augmentation and exchange decreed herein." As did the water court, we find that this term adequately identifies the CWCB's instream flow water rights and protects those rights from any potential injury this plan might cause.

Likewise, we affirm the water court's finding that the proposed plan for augmentation will cause no injurious effect to vested water rights or conditional water rights. In general, the Assistant Division Engineer, Kyle Whittaker, testified that he had received no complaints from any water user about the Authority's prior use of the depletion table. Further, the Authority presented testimony from Thomas Williamsen, a water resources engineer, who maintained that use of the table to calculate out-of-priority depletions would protect all senior water rights from injury. Williamsen also stated that the table represented a reasonable estimate of the depletions presently occurring from out-of-priority depletions in each member entity, and that the table accounted for depletions in

time and amount. Finally, Williamsen testified that development within the Authority's service area has proceeded in a manner consistent with the projected ratio of uses between in-house and outdoor irrigation as contained in the Original Decrees. Williamsen's engineering report reinforced his testimony; the report explaining the depletion table remains accurate presently and the mix of uses in the Authority's service area has not materially changed since the projections contained in the Original Decrees were made.

Specifically regarding in-house use, Williamsen contended that the Authority's table uses conservative 8–9% in-house depletion estimates for Avon and Eagle–Vail. A more accurate and generally accepted number for in-house depletions, Williamsen claimed, is 5%, and the difference between actual and estimated in-house depletions may lead the Authority to regularly overestimate its augmentation obligations for those service areas. Indeed, even the CWCB experts Whittaker and Bahman Hatami both confirmed that a reasonable and customary estimate of in-house depletions runs to 5%. In short, more than enough evidence was marshaled to justify reliance on the table's projected in-house depletion rates, which accounts for all of the winter out-of-priority depletions in the Authority's service area.

The question of whether the Authority met its obligation of showing no injury using the table's irrigation depletion projections is, however, a closer call, as the Authority's evidence was not nearly as compelling as its evidence regarding in-house depletion rates. The Authority presented evidence from Williamsen, who testified that the Authority is not irrigating more acres than allowed or anticipated by the Original Decrees. Williamsen also averred that the mix of development within the Authority between in-house use and irrigation use has generally proceeded as projected in the Original Decrees, and there is actually less irrigation as a percentage of total use than was estimated in the Original Decrees. Aside from Williamsen's pronouncement that the table accurately replaces current depletions in time and amount, no other evidence was put forth to verify that the table accurately reflects de-

pletion rates for outdoor irrigation and, more specifically, for sprinkler use. Nevertheless, the water court relied on Williamsen's testimony to determine the Authority had presented a prima facie case that use of the table would cause no injury, and we will not independently evaluate Williamsen's credibility or disturb the water court's factual findings unless wholly unsupported by the record. *See Yale Invs., Inc.*, 886 P.2d at 699; *Bd. of County Comm'rs. v. Upper Gunnison River Water Conservation Dist.*, 838 P.2d 840, 847 (Colo.1992).

Our decision to affirm is informed by the CWCB's inability to present any countervailing evidence that would show the Authority's proposed augmentation plan would cause injury, either to the CWCB or to any vested water right. Neither Hatami nor Whittaker, experts for the CWCB, testified that he had any evidence the depletion table was inaccurate. Hatami stated he could not opine that the table was insufficient to protect against injury. Likewise, Whittaker stated that he could summon no evidence to show that any water user had been or would be injured by reliance on the depletion table to calculate replacement obligations. Indeed, Whittaker could not refute the Authority's assertion that the table would more than sufficiently replace the Authority's out-of-priority depletions. All told, Hatami and Whittaker could offer nothing more than conjecture that the depletion table might be inaccurate and therefore might result in underreplacement of out-of-priority depletions, which cannot suffice to shift the burden of proof back to the Authority. *Yale Invs., Inc.*, 886 P.2d at 696 (noting injury must be demonstrated by facts, not potentialities).

The CWCB disagrees with the water court's analytical framework, contending that the court prematurely jumped to an injury determination without preliminarily requiring the Authority to account for its actual mix of uses and the current depletions from those uses. Instead, the CWCB claims the water court was required to first consider the amount and timing of the applicant's depletions, and the amount and timing of available replacement water, only after which it could entertain consideration of the plan's injurious effects. *See City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r*, 105 P.3d 595, 615 (Colo.2005).

■ We cannot endorse this cramped analysis. The CWCB's construction would artificially bifurcate the procedure for review of an augmentation plan, an interpretation that has no support in the actual text of the statute, which reads in part:

> In reviewing a proposed plan for augmentation and in *considering terms and conditions that may be necessary to avoid injury*, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water that would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right.

§ 37–92–305(8) (emphasis added). As the statute makes clear, the water judge must consider depletions from an applicant's use or proposed use of water in quantity and in time *in order to* make an informed determination regarding the question of injury, and not as an end in itself. *See Farmers Reservoir & Irrigation Co.*, 33 P.3d at 808 n. 6 ("The injury analysis focuses on the time, amount, and location of return flows...."). Indeed, the section describes an integrated inquiry designed to ascertain whether vested water rights will sustain injury should the augmentation plan be approved; only if operation of the plan would cause injury to those rights does the statute require the water judge to deny the plan. Thus, consideration of the use or proposed use of water in quantity and time is intended as an aid in making the injury determination and not, as the CWCB urges, as an independent query that can defeat the proposed augmentation plan. *See Colo. Water Conservation Bd. v. City of Cent.*, 125 P.3d 424, 437 (Colo.2005) ("Subsection (8) provides additional factors to be considered in making an injury determination for plans for augmentation.").

Here, as was required by the statute, the water court considered figures regarding build-out of the Authority's service area, the amount of irrigated acreage, and the mix of

uses between in-house and outdoor irrigation. After hearing such testimony describing the proposed timing and amount of the Authority's depletions, the water judge applied that evidence to arrive at his conclusion that the proposed augmentation plan would cause no injury to any vested water right. As such, we uphold the water court's review of the Authority's proposed augmentation plan.

While we affirm the water court's ruling in this case, we do so with significant reservations about the Authority's use of the projected depletions table, which was never premised upon an actual mix of uses or actual depletion rates but rather dated estimates of those figures. However, augmentation adjudications require such predictions of future injury, which involve an inherent amount of uncertainty, *Willows Water Dist.*, 856 P.2d at 835–36, and doing the best it could with what it had, the water court correctly found that the Authority presented a prima facie case of no injury and that the CWCB could muster no evidence to contradict such a finding. Indeed, uncertainties are not fatal to a plan for augmentation. *Id.* We do suspect, though, that both the Authority and the CWCB would have been better equipped to answer questions of injury had the CWCB raised the issue of reliance on the depletion table earlier in the litigation. More definite answers to these questions may hinge on the water court's retained jurisdiction, which will operate as a test period for the water court's findings by allowing for reconsideration of the depletion table if actual operation of the plan results in injury. § 37–92–304(6); *City of Aurora*, 105 P.3d at 616.

### III. Claim Preclusion

■ The Authority argues, in the alternative, that the CWCB is barred by claim preclusion from challenging the Authority's reliance on the depletion table in this case because the CWCB failed to oppose use of the depletion table to calculate replacement obligations in Case No. 98CW205, to which the CWCB was a party. While the water court determined that it need not reach this issue because the Authority had met its burden of proof showing absence of injurious effect, we briefly discuss the Authority's ar-

gument to make clear that the water court may not summarily discharge its obligation to engage in an injury determination mandated by section 37–92–305(8) simply by invoking principles of claim preclusion.

■ Claim preclusion, or res judicata, constitutes an absolute bar to relitigation only when, in both the prior and subsequent suits, there is identity of subject matter, identity of cause of action, identity of parties to the action, and identity of capacity in the persons against whom the claim is made. *Ready Mixed Concrete Co. v. Farmers Reservoir & Irrigation Co.*, 115 P.3d 638, 646 (Colo.2005) (finding that in proposing a change from its prior decree, the applicant altered the subject matter, the cause of action, and the parties affected by the proposed action); *Concerning Application for Water Rights of Midway Ranches Prop. Owners' Ass'n, Inc.*, 938 P.2d 515, 524 (Colo.1997); *Weibert v. Rothe Bros.*, 200 Colo. 310, 318, 618 P.2d 1367, 1372 (1980).

The Authority urges that there is a close parallel between this case and *Midway Ranches*, because, in *Midway Ranches*, the preclusion issue involved re-quantification of historic consumptive use, while here the issue centers on the estimated quantification of the existing and future consumptive use within the Authority's service areas. In *Midway Ranches*, this court held that res judicata bars an objector opposing an augmentation plan from litigating claims regarding historical usage that could have been brought when historical usage was previously at issue and actually determined. Because a "yield per share which can be removed for use in an augmentation plan is not expected to differ from augmentation case to augmentation case," res judicata was "important to the stability and reliability of Colorado water rights." 938 P.2d at 525–26. The court cautioned, however, that "we do not hold that res judicata should bar the water court from addressing circumstances which have changed subsequent to the previous determination, nor does this doctrine preclude the water court from determining historic use in a change, augmentation, or expanded use injury case when such historic use has not

been determined in a previous proceeding." *Id.* at 525.

We find the Authority's comparison unpersuasive. The adjudication of historical usage—the measure and limit of a mature water right—is not expected to differ from augmentation case to augmentation case, because it is susceptible to actual quantification based on past beneficial use, which forms the backbone of the state's priority system. To hold that such a finding is not entitled to preclusive effect would be to undermine the stability and reliability of Colorado's prior appropriation regime. In contrast, the table at issue here consists of dated estimates as to future depletion rates and potential mix of uses—hardly the stuff upon which to bar new information or data in later augmentation adjudications.[7]

A more apt analogy might be drawn between the case at hand and *Boulder & White Rock Ditch & Reservoir Co. v. City of Boulder*, 157 Colo. 197, 402 P.2d 71 (1965). In that case, objectors sought to prohibit the City of Boulder from changing a point of diversion, and Boulder countered by arguing that two prior changes in point of diversion actions precluded the objectors from challenging the third. This court held that consent to a prior change of point of diversion does not bar challenge to a later application for a change of point of diversion, as "the subject matter, though similar, is not the same, and it is hard to conceive of such a case where conditions, uses and even users would be exactly the same." *Id.* at 203, 402 P.2d at 74. As such, a party might well be differently affected by a later decreed change than by one entered much earlier. Therefore, "each change of a point of diversion must necessarily rest upon circumstances as they are found to exist at the time the change is requested—thus res judicata cannot play a part in such proceedings." *Id.;* *see also City of Westminster v. Church*, 167

Colo. 1, 9, 445 P.2d 52, 56 (1968) (rejecting claim of res judicata because a prior change in point of diversion "did not immunize the City of Westminster against subsequent equitable actions by junior appropriators designed to maintain the historic level of use by the City of its decreed rights").

Just as differences from one change of point of diversion action to another render claim preclusion inappropriate, so too do small differences between augmentation plans prevent operation of claim preclusion. Because each augmentation plan must uniquely account for the structures, diversions, beneficial uses, timing and amount of depletions to be replaced, along with how and when the replacement water will be supplied, and how the augmentation plan will be operated, it is difficult to imagine two augmentation plans for which conditions would be exactly the same. Indeed, the augmentation plan before us involves different water rights, structures, and augmentation sources than those called for in previous augmentation decrees for the Authority's service areas, and thus no identity of claim or cause of action exists between prior augmentations and the present case.[8] As each augmentation case, like each change case, must rest on circumstances as they are found to exist at the time that change is requested, res judicata cannot preclude consideration of the individual circumstances of each plan.

## IV. Conclusion

In conclusion, we affirm the water court's approval of the Authority's proposed decree, because evidence in the record supports its factual determination that the Authority's augmentation plan will not cause injury to other water users. However, we hold that claim preclusion cannot bar consideration of the individual circumstances of each augmen-

---

7. We are particularly concerned about Williamsen's testimony that he did not independently attempt to ascertain actual irrigation use because he felt bound by the table, which had been attached to the previous decree in Case No. 98CW205.

8. For instance, the augmentation plan in the present case calls for Wolford and Ruedi Reservoirs—both downstream augmentation sources—to provide replacement water; whereas in Case No. 98CW205, the Authority sought approval to use Eagle Park Reservoir, an upstream augmentation source, to fulfill its replacement obligations.

tation plan including, in this case, the Authority's depletion table.